ANNETTE KINGSLAND ZIEGLER, J.
¶ 1. This is a review of a published decision of the court of appeals,[1] which affirmed judgments of conviction entered by the Milwaukee County Circuit Court, Judge Patricia D. McMahon, after a jury found Richard Lavon Deadwiller (Deadwiller) guilty of two counts of second-degree sexual assault by use of force, contrary to Wis. Stat. § 940.225(2) (a) (2005-06).[2] During Deadwiller's trial, Wisconsin State Crime Lab analyst Ronald G. Witucki (Witucki) testified that an out-of-state lab, Orchid Cell-mark (Orchid), analyzed vaginal and cervical swabs taken from the two victims, Kristina S. and Chantee O. Orchid produced DNA profiles of semen found on the *142 victims' swabs. After receiving the DNA profiles from Orchid, Witucki entered the DNA profiles into the DNA database, which resulted in a match to Deadwiller. No one from Orchid testified at Deadwiller's trial. The jury convicted Deadwiller of two counts of second-degree sexual assault by use of force. Deadwiller appealed, arguing that his right to confrontation was violated when the circuit court allowed Witucki to rely on the DNA profiles produced by Orchid. The Confrontation Clause prohibits the introduction of testimonial hearsay of a witness who is absent from trial unless the witness is unavailable and the defendant had the prior opportunity to cross-examine the witness. Crawford v. Washington, 541 U.S. 36, 51, 59 (2004). The court of appeals affirmed, concluding that Deadwiller's right to confrontation was not violated because the DNA profiles produced by Orchid were not testimonial under Williams v. Illinois, 567 U.S._, 132 S. Ct. 2221 (2012). State v. Deadwiller, 2012 WI App 89, ¶ 14, 343 Wis. 2d 703, 820 N.W.2d 149. We affirm the court of appeals.
¶ 2. We conclude that on the facts of this case, Witucki's testimony did not violate Deadwiller's right to confrontation. Applying the various rationales of Williams, a majority of the United States Supreme Court would come to the same conclusion as in Williams, that the expert's testimony did not violate the defendant's right to confrontation. Moreover, Deadwiller did not challenge the substance of Witucki's testimony because his defense was that the intercourse did occur but that the victims consented.
¶ 3. Further, assuming arguendo that the admission of Witucki's testimony violated Deadwiller's right to confrontation, we conclude that the error was harmless in light of the defendant's previous admissions of *143 sexual intercourse with the victims and the fact that throughout the proceedings, he maintained a defense that the victims consented.
I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE
¶ 4. On August 27, 2007, Deadwiller was charged with one count of second-degree sexual assault by use of force in violation of Wis. Stat. § 940.225(2)(a). The complaint alleged that on July 12, 2006, Deadwiller sexually assaulted Kristina S. by striking her in the head, forcing her to the ground, and forcing her to have sexual intercourse. On October 4, 2007, Deadwiller was charged in a separate case with one count of second-degree sexual assault by use of force contrary to Wis. Stat. § 940.225(2)(a). The complaint alleged that on August 12, 2006, Deadwiller sexually assaulted Chantee O. by grabbing her from behind, punching her in the jaw, forcing her to the ground, and forcing her to have sexual intercourse.[3]
¶ 5. On March 26, 2008, the State filed a motion in limine seeking a ruling that the testimony of Witucki would be admissible at trial. The motion confirmed that Witucki was not the analyst who developed the DNA profiles from the semen recovered on the victims' vaginal and cervical swabs. However, Witucki entered Orchid's DNA profiles into the DNA database and obtained a match to Deadwiller. Thereafter, Witucki *144 received a buccal (cheek) swab from Deadwiller and compared the new sample to the Orchid DNA profiles, again resulting in a match. The State argued that Witucki independently concluded that Deadwiller was a match for the DNA recovered from the victims and that "[a] defendant's confrontation right is satisfied if a qualified expert testifies as to his or her own independent opinion, even if the opinion is based in part on the work of another." State v. Barton, 2006 WI App 18, ¶ 20, 289 Wis. 2d 206, 709 N.W.2d 93 (citing State v. Williams, 2002 WI 58, ¶¶ 9, 11, 253 Wis. 2d 99, 644 N.W.2d 919).[4] Deadwiller opposed the State's motion, arguing that he was entitled to confront the Orchid analysts who completed the DNA profiles on the victims' swabs. The circuit court ruled that under Barton and State v. Williams, Witucki would be permitted to testify about the DNA results, assuming the proper foundation and credentials were presented.
¶ 6. In preparation for trial, Deadwiller hired an expert to review the DNA evidence in this case, and the trial was delayed several times because Deadwiller's expert had not completed his analysis. At a pretrial conference on March 26, 2008, Deadwiller reported that he wanted to go forward with the trial even though he had not received the expert's analysis. The circuit court confirmed that Deadwiller wanted to proceed to trial without his expert:
THE COURT: The question is do you want to go to trial and waive your right, give up your *145 right to have this expert who is working on some information, or shall we set another date so your expert can complete the work he started... .
THE DEFENDANT: I want to go to trial.
THE COURT: You want to go to trial on Monday without an expert.
THE DEFENDANT: Yes.
The State then added that Deadwiller's decision was reasonable because "Deadwiller's made statements admitting sexual intercourse. . .. It's going to be in my view a credibility case, so I think this is a reasonable decision if he wants a speedy trial." Deadwiller agreed with the prosecutor that the main issue in the case was whether the women consented or whether he forced them to have intercourse: "I agree with [the prosecutor] 100 percent." In other words, even before the trial began, Deadwiller's defense was that the women consented to the intercourse. He did not challenge that his DNA was found in the victims.
¶ 7. On April 7, 2008, Deadwiller's jury trial began. The jury heard testimony from Kristina S., Chan-tee O., a sexual assault nurse, several police officers, Witucki, and Deadwiller. Kristina S. testified that on July 12, 2006, she had an argument with her boyfriend, left the apartment where they had been staying, and was locked out. Kristina S. testified that she walked to a nearby gas station to call her boyfriend to let her back into the apartment but was unable to reach him. Walking back towards the apartment, Kristina S. testified that Deadwiller began talking to her and offered to let her use the phone at his house. She testified that she walked with him until they approached a dark alley, at which point she stopped. She then testified that Dead- *146 wilier grabbed her arm, hit her in the face, told her to take her pants down, threatened to kill her if she refused, then forced her to have sexual intercourse. Kristina S. testified that she immediately reported the crime, went to the Sexual Assault Treatment Center at Aurora Sinai Hospital, and underwent a sexual assault examination. Kristina S. testified that she did not consent to having sex with Deadwiller, nor did she agree to have sex with Deadwiller in exchange for money or drugs. Rather, she testified that "he raped me."
¶ 8. Chantee O. testified that on August 12, 2006, she was walking on the 16th Street bridge in Milwaukee and was going to catch a bus home. She testified that three people, including Deadwiller, were waiting for the bus on the opposite side of the street. According to Chantee O.'s testimony, Deadwiller informed her that her bus stop was down a set of stairs and that he would show her where it was located. Chantee O. testified that Deadwiller led her a short way from the bottom of the stairs, hit her in the jaw, told her to take down her pants, then forced her to have sexual intercourse. Chantee O. testified that immediately after the assault, she flagged down a police car, went to the Sexual Assault Treatment Center at Aurora Sinai Hospital, and underwent a sexual assault examination. Similar to Kristina S., Chantee O. testified that she did not have sex with Deadwiller voluntarily nor did she have sex in exchange for drugs or money.
¶ 9. The State then called several witnesses to establish a chain of custody for the evidence collected during the victims' sexual assault examinations. Tanya Wieland, a sexual assault nurse examiner at Aurora Sinai, testified that she conducted the examination on both victims, packaged and labeled all of the evidence collected, including vaginal and cervical swabs, and *147 turned the evidence over to hospital security, which keeps evidence in a secure room until picked up by the police. Two officers testified that they picked up the evidence collected from Kristina S. and Chantee O. from the secure room at Aurora Sinai, opened the outer bag (without opening the bags on the individual items) to inventory the evidence, and turned over the evidence to the police department's property control section. Detective Lori Gaglione then testified that the items of evidence were transported from the property control section to the State Crime Lab (SCL), which gives a receipt when evidence is submitted. Gaglione testified that in both cases, the case number on the SCL receipt corresponded to the case number on the police inventory sheet.
¶ 10. Witucki then testified regarding the DNA evidence, including that, in his opinion, DNA recovered from the victims matched Deadwiller. He testified to his qualifications, including 20 years of working at the SCL, degrees in technology and biology, and training in forensic serology, semen identification techniques, and DNA typing methods. Witucki testified that the SCL had a contract with Orchid to reduce the backlog of DNA case work, whereby the SCL sent evidence to Orchid, which ran the necessary testing and sent back results for the SCL to review. Witucki testified that he was familiar with Orchid's protocols because it was accredited by the same agency that accredited the SCL and Orchid submitted its protocols when it first applied for the contract with the SCL.
¶ 11. The SCL received evidence in Kristina S.'s case in July 2006 and evidence in Chantee O.'s case in August 2006. Between the time the SCL receives the evidence and the time it is sent to Orchid, Witucki testified that the evidence is individually sealed and *148 stored in a freezer or evidence control room. The SCL sent samples to Orchid in Kristina S.'s case in April 2007 and Chantee O.'s case in November 2006. The SCL received samples from Orchid in Kristina S.'s case on July 5, 2007, and Chantee O.'s case on July 6, 2007. Witucki testified that the SCL follows protocols and maintains records of evidence by assigning a case number upon receipt of evidence, storing the evidence in a control room or freezer, and recording the shipping labels if evidence is sent to an out-of-state lab.[5]
¶ 12. Witucki testified that he received a "report and all the electrophoreticgrams[6] and the necessary documentation" from Orchid with respect to both victims, and that he personally completed all of the work on the cases after the SCL received the reports from Orchid. Witucki testified that the case number on the documentation received from Orchid corresponded to *149 the SCL case numbers for Kristina S. and Chantee O. Upon receipt of Orchid's report, Witucki testified that he analyzed both cervical swabs and determined that there was a foreign male DNA profile present in both swabs. Witucki testified that he "check[ed] to see that [Orchid] followed their procedures, that their quality control measures were followed, [and] they got acceptable results on their control values." He testified that he "evaluate[d] the electrocphoreticgrams, [sic] which is the end product or the typing results from the evidence, and we determine if it's of sufficient quality for entry into our local DNA data base." Witucki testified that he entered the DNA profiles from Orchid into the DNA database, which returned a result that DNA recovered from both victims matched each other and matched Deadwiller. Once the match was returned, Witucki testified that he checked that the profiles were entered correctly into the database and personally confirmed that the DNA profiles matched. He then testified that a computer match is not conclusive proof, but "investigative information." Thereafter, the police obtained a buccal swab from Deadwiller, and Witucki testified that he "develop [ed] a DNA profile from those buccal swabs, then compare [d] them to the profiles that were generated by Orchid Cellmark from the cervical swabs of Chantee O. and vaginal swabs of Kristina S." Witucki concluded that there was a match:
State: Did you reach an opinion to a reasonable degree of scientific certainty with respect to whether or not Mr. Deadwiller was the source of the male DNA found in [Chantee O.'s] cervical swabs?
Witucki: Yes, I did.
State: What is your opinion?
*150 Witucki: Well, they matched all 13 genetic locations that we test for; and I ran a statistical calculation on that profile, and it was of a sufficient number that allowed me to determine in my opinion that the semen found on the cervical swabs of Chantee O. originated from Richard Deadwiller.
State: With respect to Kristina S., did you compare the DNA profile that you developed from Richard Deadwiller with the foreign DNA found on her vaginal swabs?
Witucki: Yes, I did.
State: Do you know what the source of that foreign male DNA found on her vaginal swabs was?
Witucki: Again, as in Chantee O.'s case, for the profile developed from the vaginal swabs of Kristina S., there was a match [for] all 13 genetic locations; and I ran a statistical calculation and that allowed me to determine that in my opinion, it was a high enough number that Richard Deadwiller was the source of the semen....
None of the documentation completed by Orchid was introduced into evidence. The State rested its case after Witucki's testimony.
¶ 13. Deadwiller testified in his defense. In his version of the events, both women offered to have sex with him for money and consented to having sex with him. He testified that Kristina S. may have had motivation to lie because she tried to run away from him after he paid Kristina S. upfront, and he "slapped her on the side of the head like to stop her and she fell." Further, he testified that Chantee O. may have had *151 motivation to lie because he paid her only $10 after they had agreed on a price of $15.
¶ 14. The jury found Deadwiller guilty on both counts. Deadwiller was sentenced to 20 years' imprisonment on each count, consisting of 15 years of confinement and 5 years of extended supervision for each count.
¶ 15. Deadwiller appealed, arguing that "the trial court violated his right to confrontation by allowing a technician from the Wisconsin State Crime Laboratory to rely on a scientific report that profiled the DNA left on the victims by their attacker." Deadwiller, 343 Wis. 2d 703, ¶ 1. The court of appeals affirmed the conviction, and it relied on the recent United States Supreme Court case of Williams, which presented very similar facts to Deadwiller's case. Id., ¶¶ 8, 14. Though Williams is a fractured opinion, "five justices agreed at the core that the outside laboratory's report was not testimonial." Id., ¶ 12. The court of appeals declined to adopt exclusively any of the three rationales presented, stating that it was "bound by the judgment in Williams." Id., ¶ 14.
¶ 16. Deadwiller petitioned this court for review, and we granted his petition on January 14, 2013.
II. STANDARD OF REVIEW
¶ 17. The question presented in this case is whether Deadwiller's right to confrontation was violated by Witucki's use of the DNA profiles developed by Orchid. While "a circuit court's decision to admit evidence is ordinarily a matter for the court's discretion, whether the admission of evidence violates a defendant's right to confrontation is a question of law *152 subject to independent appellate review." State v. Williams, 253 Wis. 2d 99, ¶ 7 (citing State v. Ballos, 230 Wis. 2d 495, 504, 602 N.W.2d 117 (Ct. App. 1999)).
III. ANALYSIS
¶ 18. We conclude that on the facts of this case, Witucki's testimony did not violate Deadwiller's right to confrontation. Applying the various rationales of Williams, a majority of the United States Supreme Court would come to the same conclusion as in Williams, that the expert's testimony did not violate the defendant's right to confrontation. Moreover, Deadwiller did not challenge the substance of Witucki's testimony because his defense was that the intercourse did occur but that the victims consented.
¶ 19. Further, assuming arguendo that the admission of Witucki's testimony violated Deadwiller's right to confrontation, we conclude that the error was harmless in light of the defendant's previous admissions of sexual intercourse with the victims and the fact that throughout the proceedings, he maintained a defense that the victims consented.
A. Confrontation Clause
¶ 20. The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him." In Crawford, the Court held that the Confrontation Clause permitted the admission of "[tjestimonial statements of witnesses absent from trial. . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. at 59. The *153 Court stated that "witnesses" against the defendant are "those who bear testimony." Id. at 51. The Court defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. The Confrontation Clause is concerned with "a specific type of out-of-court statement," such as affidavits, depositions, custodial examinations, prior testimony, and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52.
¶ 21. After Crawford, a flurry of Confrontation Clause jurisprudence has ensued over what constitutes a "testimonial statement."[7] The Court recently decided *154 Williams, which is factually similar to Deadwiller's case.[8] See infra, ¶ 32. In that case, Williams was charged with aggravated sexual assault of a woman, L.J. Williams, 567 U.S._, 132 S. Ct. at 2229. After the assault, L.J. reported the attack, went to the hospital, and underwent a sexual assault examination. Id. The police picked up the evidence collected from L.J., labeled the evidence with an inventory number, and sent it under seal to the state crime lab. Id. The crime lab sent the evidence to a Cellmark Diagnostics Laboratory *155 in Maryland. Id. Cellmark sent back L.J.'s swabs and a "report containing a male DNA profile produced from semen taken from those swabs." Id. Williams was not under suspicion at the time Cellmark completed its analysis. Id. Sandra Lambatos, a forensic specialist at the Illinois state crime lab, entered Cellmark's DNA profile into the state DNA database, resulting in a match to Williams. Id.
¶ 22. Williams was charged with, inter alia, aggravated sexual assault and was tried before a state judge. Id. Lambatos testified that it was common for "one DNA expert to rely on the records of another DNA expert," that Cellmark was an "accredited crime lab," that the state crime lab often sent genetic samples to Cellmark to reduce its backlog, and that the state crime lab employees relied on the sealed shipping containers and shipping manifests to preserve the chain of custody. Id. at 2229-30. Lambatos was shown shipping manifests and "explained what they indicated, namely, that the [state crime lab] had sent L.J.'s vaginal swabs to Cellmark, and that Cellmark had sent them back, along with a deduced male DNA profile." Id. at 2230. The prosecutor asked Lambatos whether there was a computer match between "the male DNA profile found in semen from the vaginal swabs of [L.J.]" and the "male DNA profile that had been identified" from Williams' blood. Id. Over the defendant's objection, Lambatos testified that based on her comparison of the two DNA profiles, there was a match. Id. The prosecutor did not enter the Cellmark report into evidence, nor did Lambatos read from or identify the report as the source of any of her conclusions. Id. On cross-examination, Lambatos confirmed that she did not conduct or observe any testing on the vaginal swabs, and that her testimony relied on Cellmark's DNA profile. Id. She testified that *156 she trusted Cellmark's work because it was an accredited lab and that it was unlikely the samples had been degraded or compromised because the state crime lab checked for degradation before sending the samples to Cellmark and the samples would have exhibited telltale signs had they degraded. Id. at 2230-31. Williams moved to exclude parts of Lambatos' testimony based on the Confrontation Clause, but the judge did not exclude the evidence because Lambatos' opinion "was based on her own independent testing of the data received from [Cellmark]." Id. at 2231. The judge found Williams guilty, and his conviction was affirmed by the state court of appeals and supreme court. Id.
¶ 23. The United States Supreme Court affirmed in a fractured opinion, concluding for various reasons that Lambatos' testimony did not violate Williams' right to confrontation. Id. at 2228, 2255. Justice Alito wrote for the lead opinion, which was joined by Chief Justice Roberts, Justice Kennedy, and Justice Breyer. Id. at 2227. Justice Thomas concurred in the result, but not in the lead opinion's reasoning. Id. at 2255. Justice Alito gave two rationales to support his conclusion. First, he reasoned that the DNA profile was not used to prove the truth of the matter asserted, namely, that "the report contained an accurate profile of the perpetrator's DNA." Id. at 2240. Williams argued that Lambatos' testimony violated his right to confrontation because she lacked personal knowledge that Cellmark's DNA profile was produced from the vaginal swab of the victim, L.J. Id. at 2236. Justice Alito rejected this argument, stating that under the Illinois and Federal Rules of Evidence,[9] Lambatos' testimony was not admissible for the purpose of proving that the DNA profile *157 was produced from L.J.'s vaginal swab. Id. Nor did the record support Williams' argument that the fact finder relied on Lambatos' testimony for the truth of the matter. Further, Justice Alito rebutted the dissent's argument that even if the report itself was not put into evidence, Lambatos testified to the substance of the report, and without the report, the State had insufficient evidence to prove that Cellmark's DNA profile was based on L.J.'s swab and that Cellmark's analysis was reliable. Id. at 2238. Justice Alito reasoned that the state put in traditional chain of custody evidence to prove that Cellmark's DNA profile was based on L.J.'s swab. Id. at 2237, 2239. Further, Justice Alito reasoned that it was simply improbable that shoddy lab work would result in the DNA profile of Williams, especially where Williams was not under suspicion at the time of Cellmark's testing. Id. at 2239.
¶ 24. Justice Alito explained that his rationale was consistent with Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), and Bullcoming v. New Mexico, 564 U.S. _, 131 S. Ct. 2705 (2011). Id. at 2240. In both of those cases, the forensic report was introduced for the truth of what they asserted, that Bullcoming's BAC exceeded the legal limit and that the substance Melendez-Diaz was charged with distributing was co *158 caine. Id. In contrast, Cellmark's report was not used for the truth of the matter:
In this case, the Cellmark report was not introduced into evidence. An expert witness referred to the report not to prove the truth of the matter asserted in the report, i.e., that the report contained an accurate profile of the perpetrator's DNA, but only to establish that the report contained a DNA profile that matched the DNA profile deduced from petitioner's blood. Thus,... the report was not to be considered for its truth but only for the distinctive and limited purpose of seeing whether it matched something else. The relevance of the match was then established by independent circumstantial evidence showing that the Cell-mark report was based on a forensic sample taken from the scene of the crime.
Id. at 2240-41 (citation omitted).
¶ 25. Justice Alito then explained a second, independent rationale for concluding that Lambatos' testimony did not violate Williams' right to confrontation. Id. at 2242. He explained that the Confrontation Clause refers to "witnesses against" the accused, and that in post-Crawford cases, there were two common characteristics of Confrontation Clause violations: "(a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." Id. In Williams, the Cellmark report was not "prepared for the primary purpose of accusing a targeted individual." Id. at 2243. Rather, "its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time." Id.
*159 ¶ 26. Justice Thomas concurred in the judgment, but he disagreed with Justice Alito's reasoning. Id. at 2255. Justice Thomas reached his conclusion "solely because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause":
In Crawford, the Court explained that '[t]he text of the Confrontation Clause ... applies to 'witnesses' against the accused — in other words, those who 'bear testimony." 'Testimony,' in turn, is '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' In light of its text, I continue to think that the Confrontation Clause regulates only the use of statements bearing 'indicia of solemnity.'
Id. at 2255, 2259-60 (quoting Crawford, 541 U.S. at 51 (internal citations omitted)). Justice Thomas concluded that Cellmark's report did not meet this standard because it lacked the solemnity of an affidavit or deposition. Id. at 2260. The report was "neither a sworn nor a certified declaration of fact." Id. Even though the report was produced at the request of the police, "it was not the product of any sort of formalized dialogue resembling custodial interrogation." Id.
¶ 27. Thus, although Williams was a fractured opinion, five Justices concluded that Lambatos' testimony did not violate Williams' right to confrontation. Id. at 2228, 2255.
¶ 28. Deadwiller argues that his right to confrontation was violated when the circuit court allowed Witucki to rely on the DNA profiles created by Orchid. He argues that Orchid's DNA profiles were testimonial because "[t]he State needed these results in order to prove or establish some fact, the identity of the perpetrator, at the jury trial." He argues that this case is distinguishable from Williams first because Deadwiller *160 "sought substantive use" of Orchid's result. In other words, "Witucki testified substantively that the Orchid Cellmark DNA results revealed the name of Richard Deadwiller." He argues that Williams is further distinguishable because Deadwiller had a jury trial and Williams had a bench trial.
¶ 29. The State argues that the judgment of Williams is controlling. It asserts that Deadwiller and Williams stand in substantially identical positions, and therefore, the result in Williams — that the witness' reliance on the out-of-state laboratory's DNA profile did not violate the defendant's right to confrontation — is controlling.
¶ 30. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193 (1977) (internal quotations and citations omitted). This rule is applicable only when "at least two rationales for the majority disposition fit or nest into each other like Russian dolls." Evan H. Caminker, Precedent and Prediction: The Forward-Looking Aspects of Inferior Court Decisionmaking, 73 Tex. L. Rev. 1, 33 n.120 (1994). If no theoretical overlap exists between the rationales employed by the plurality and the concurrence, "the only binding aspect of the fragmented decision ... is its 'specific result.'" Berwind Corp. v. Comm'r of Soc. Sec., 307 F.3d 222, 234 (3d Cir. 2002) (citation omitted). A fractured opinion mandates a specific result when the parties are in a "substantially identical position." Id.
¶ 31. "We need not find a legal opinion which a majority joined, but merely 'a legal standard which, *161 when applied, will necessarily produce results with which a majority of the Court from that case would agree.'" People v. Dungo, 286 E3d 442, 455 (Cal. 2012) (Chin, J., concurring) (citation omitted). Therefore, "we must identify and apply a test which satisfies the requirements of both Justice [Alito's] plurality opinion and Justice [Thomas's] concurrence." Id. at 456.
¶ 32. Though the opinions of Justice Alito and Justice Thomas in Williams have no theoretical overlap, we still apply the case because Deadwiller and Williams are in substantially identical positions. Further, applying the tests of Justice Alito and Justice Thomas results in the same conclusion as in Williams, a conclusion with which five Justices agree that Witucki's testimony did not violate Deadwiller's right to confrontation. Dead-wilier and Williams are in substantially identical positions, in fact, the facts of this case are strikingly similar to the facts in Williams. We reject the defendant's arguments that Orchid's DNA profiles were used "substantively" in this case but not in Williams, and we reject his argument that because he had a jury trial, Witucki's testimony violated the Confrontation Clause. See infra, n.ll. Both cases involve defendants accused of sexually assaulting a victim. In both cases, the victim reported the crime and underwent a sexual assault examination, which produced vaginal swabs containing DNA of the perpetrator. In both cases, police officers picked up the evidence, inventoried the evidence, and sent the evidence to the state crime lab, which then sent the evidence to an out-of-state laboratory for DNA testing. Further, the out-of-state laboratory in both cases sent back the genetic material and a DNA profile of the perpetrator produced from the vaginal swabs. In both cases, state crime lab analysts entered the DNA profile into a DNA *162 database, which resulted in a match to the defendant.[10] When called to testify, the state crime lab analyst in both cases reported that the DNA profile sent by the out-of-state lab matched the DNA profile resulting from the database. The DNA profile was not introduced into evidence in either case. Prosecutors in both cases introduced inventory reports, evidence receipts, and testimony to prove a chain of custody, i.e. that the DNA profile was produced from swabs taken from the victims.
¶ 33. Applying the rationales of Justice Alito and Justice Thomas " 'necessarily produce[s] results with which a majority of the Court from that case would agree.'" Dungo, 286 R3d at 455 (Chin, J. concurring) (citation omitted). Under Justice Alito's first rationale, Orchid's DNA profiles were not used for the truth of the matter asserted. Williams, 567 U.S. _, 132 S. Ct. at 2236. Just as Lambatos' testimony was not admissible for the purpose of proving that Cellmark's DNA profile was produced from semen found in L.J.'s vaginal swabs under Illinois and federal law, see id., nor is Witucki's testimony admissible for proving that Orchid's DNA profiles were produced from semen found in Kristina S. or Chantee O.'s vaginal swabs. See Wis. Stat. § 907.03. As the prosecutor did in Williams, the State used traditional chain of custody evidence to prove that Orchid's DNA *163 profiles were produced from the swabs taken from Kristina S. and Chantee O.[11] 567 U.S._, 132 S. Ct. at 2237, 2239.
¶ 34. Under Justice Alito's second rationale, Orchid's DNA profiles did not run afoul of the Confrontation Clause because they did not involve "out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct." Id. at 2242. As in Williams, Deadwiller was not under *164 suspicion at the time Orchid conducted its analysis. In seeking the DNA profile, the State's "primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time."[12] Id. at 2243.
¶ 35. Under Justice Thomas' rationale, Orchid's DNA profiles lacked the solemnity of an affidavit or deposition. Id. at 2260. There is no indication that the Orchid analyst swore to the test results or that the DNA profiles contained certified declarations of fact.[13] Id. Even though the reports were produced at the request of the police, there is no evidence that they were the product "of any sort of formalized dialogue resembling custodial interrogation." Id.
¶ 36. Deadwiller is in a substantially identical position as Williams. Berwind, 307 F.3d at 234. Applying the rationales of Justice Alito and Justice Thomas leads to the same conclusion as in Williams — Witucki's testimony did not violate Deadwiller's right to confrontation. Further, it is worth nothing that in this case, Deadwiller did not challenge the substance of Witucki's *165 testimony. The accuracy of the DNA results was a side issue in this case because Deadwiller's defense was that the intercourse did occur but that the victims consented.
¶ 37. Our conclusion is consistent with past Wisconsin Confrontation Clause jurisprudence, namely State v. Williams and Barton. In State v. Williams, the defendant was charged with, inter alia, possession of cocaine with the intent to deliver. 253 Wis. 2d 99, ¶ 1. At trial, the original analyst was unavailable to testify, and another analyst, Sandra Koresch, who had performed a peer review of the original analyst's work, testified that the substance Williams was charged with possessing was cocaine. Id., ¶ 4. The defendant argued that Koresch's testimony violated his right to confrontation. Id., ¶ 5. The court concluded that Williams' right to confrontation had not been violated:
[T]he presence and availability for cross-examination of a highly qualified witness, who is familiar with the procedures at hand, supervises or reviews the work of the testing analyst, and renders her own expert opinion is sufficient to protect a defendant's right to confrontation, despite the fact that the expert was not the person who performed the mechanics of the original tests.
Id., ¶ 20. However, "one expert cannot act as a mere conduit for the opinion of another." Id., ¶ 19.
¶ 38. In Barton, the defendant was charged with arson. 289 Wis. 2d 206, ¶ 3. The original analyst, David Lyle, had retired by the time of Barton's trial, and the technical unit leader, Kenneth Olson, testified that there had been ignitable substances found at the scene of the crime. Id., ¶ 4. Olson had performed a peer review of Lyle's tests and presented his own conclusions regarding the tests to the jury. Id. Under State v. *166 Williams, the court concluded that Barton's right to confrontation had not been violated:
Like the unit leader's testimony in [State v.] Williams, Olson's testimony was properly admitted because he was a qualified unit leader presenting his individual, expert opinion. Olson not only examined the results of Lyle's tests, but he also performed a peer review of Lyle's tests. He formed his opinion based on his own expertise and his own analysis of the scientific testing. He then presented his conclusions to the jury, and he was available to Barton for cross-examination. Thus, Olson's testimony satisfied Barton's confrontation right and is admissible under the supreme court's decision in [State v.] Williams.
Id., ¶ 16. The court of appeals also rejected Barton's argument that Crawford undermined the rule of State v. Williams. Id., ¶ 20. The court stated that "[a] defendant's confrontation right is satisfied if a qualified expert testifies as to his or her independent opinion, even if the opinion is based in part on the work of another" expert:
Crawford does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion.
Id., ¶¶ 20, 22 (quoting People v. Thomas, 30 Cal. Rptr. 3d 582, 587 (Cal. Ct. App. 2005)).
¶ 39. Deadwiller asserts that this case is distinguishable from State v. Williams and Barton because Witucki was merely a conduit for Orchid's analysis. The State argues that just as in State v. Williams and *167 Barton, a defendant's right to confrontation was not violated because Witucki was highly qualified as an analyst, reviewed Orchid's work, and independently determined that the DNA recovered from the victims was a match to Deadwiller.
¶ 40. In this case, Witucki's testimony was similar to that of the testifying analyst in State v. Williams and Barton. Witucki was a highly qualified expert. When the victims' swabs first came in, Witucki confirmed the presence of semen. Once Witucki received Orchid's DNA profile, he reviewed the profile to make sure that Orchid followed its procedures and quality control measures and that it obtained acceptable results. Witucki also evaluated the profile to make sure it was of sufficient quality to enter into the DNA database. After the computer showed a match between Deadwiller and the Orchid DNA profiles, Witucki obtained a buccal swab from Deadwiller, developed a DNA profile from that swab, and reconfirmed that Deadwiller was a match. Thus, Witucki was not merely a conduit for Orchid's DNA profiles, but he independently concluded that Deadwiller was a match to Orchid's DNA profiles. See State v. Williams, 253 Wis. 2d 99, ¶ 20. Therefore, Witucki's testimony was sufficient to protect Deadwiller's right to confrontation.
B. Harmless Error
¶ 41. Assuming arguendo that allowing Witucki to testify about Orchid's DNA profiles violated Deadwiller's right to confrontation, that violation was harmless. A Confrontation Clause violation does not result in automatic reversal, but is subject to harmless error analysis. State v. Jensen, 2011 Wl App 3, ¶ 30, *168 331 Wis. 2d 440, 794 N.W.2d 482; State v. Weed, 2003 WI 85, ¶ 28, 263 Wis. 2d 434, 666 N.W.2d 485; State v. Williams, 253 Wis. 2d 99, ¶ 50. For an error to be harmless, the party who benefitted from error must show that" 'it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" State v. Martin, 2012 WI 96, ¶ 45, 343 Wis. 2d 278, 816 N.W.2d 270 (quoting State v. Harvey, 2002 WI 93, ¶ 49, 254 Wis. 2d 442, 647 N.W.2d 189). In other words, "an error is harmless if the beneficiary of the error proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. (internal quotations omitted). To conclude that the error was harmless, this court must determine that "the jury would have arrived at the same verdict had the error not occurred." Id. (citations omitted). Several factors guide our analysis: "the frequency of the error; the importance of the erroneously admitted evidence; the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence; whether the erroneously admitted evidence duplicates untainted evidence; the nature of the defense; the nature of the State's case; and the overall strength of the State's case." Id., ¶ 46.
¶ 42. Deadwiller argues that the introduction of Witucki's testimony was not harmless. Deadwiller points out that his prior statements to the police — that he had sexual intercourse with both women (asserting that it was consensual and that he paid them) — were not introduced by the State. Deadwiller argues that he had to change his defense strategy because of the violation, i.e. he decided to testify that the sex was consensual only after the State introduced the DNA evidence. The State, on the other hand, argues that any error was harmless. Deadwiller admitted that he was *169 the source of the semen, and his defense strategy throughout the whole proceedings was that the sex was consensual.
¶ 43. We agree with the State and conclude that even if admitting Witucki's testimony violated Deadwiller's right to confrontation, that error was harmless. First, Deadwiller made statements to the police admitting that he had sexual intercourse with the victims. At a pretrial conference, the court asked the prosecutor whether he intended to use those statements, and he responded that "I guess that is going to depend on the DNA and if the Court allows Mr. Witucki to testify. I don't intend to use his statements. If that is not resolved, then I may put his statements on just to show this is really a consent case." If Witucki had not testified, the State could have used Deadwiller's statements to prove the same fact — that Deadwiller was the source of the semen recovered from the victims. Second, Deadwiller made several statements indicating that he did not challenge the DNA results, but rather was basing his defense on the theory that Kristina S. and Chantee O. consented to the sexual intercourse. At a pretrial conference days before the trial was scheduled to begin, Deadwiller reported that his DNA expert had not completed the review of evidence in this case. The court informed Deadwiller that he "could go to trial with your expert if we put it at another date at a later time" and asked him several times whether he wanted to proceed without his DNA expert. The defendant answered affirmatively six times, insisting that he wanted to proceed without his expert. The State added that the DNA was going to be a side issue in the case; that Deadwiller's defense was going to be that the victims consented, and that this was going to be a *170 credibility case. Deadwiller responded that "I agree with him 100 percent." In other words, whether intercourse occurred, the subject of the expert's testimony was irrelevant to Deadwiller's defense because his defense was that the intercourse did occur but that the victims consented. At trial, the defendant testified that Kristina S. and Chantee O. both consented to having sexual intercourse with him and that he did not dispute that his semen was found in both victims. Throughout the entire proceedings, Deadwiller's defense strategy was that the sexual intercourse was consensual. Therefore, even if Witucki's testimony violated Deadwiller's right to confrontation, that error was harmless beyond a reasonable doubt.
IV CONCLUSION
¶ 44. We conclude that on the facts of this case, Witucki's testimony did not violate Deadwiller's right to confrontation. Applying the various rationales of Williams, a majority of the United States Supreme Court would come to the same conclusion as in Williams, that the expert's testimony did not violate the defendant's right to confrontation. Moreover, Deadwiller did not challenge the substance of Witucki's testimony because his defense was that the intercourse did occur but that the victims consented.
¶ 45. Further, assuming arguendo that the admission of Witucki's testimony violated Deadwiller's right to confrontation, we conclude that the error was harmless in light of the defendant's previous admissions of sexual intercourse with the victims and the fact that throughout the proceedings, he maintained a defense that the victims consented.
By the Court. — The decision of the court of appeals is affirmed.
*171 ¶ 46. MICHAEL J. GABLEMAN, J., did not participate.

 State v. Deadwiller, 2012 WI App 89, 343 Wis. 2d 703, 820 N.W.2d 149.

 All subsequent references to the Wisconsin Statutes are to the 2005-06 version unless otherwise indicated.

 The case involving Kristina S. was assigned circuit court case number 2007CF4140. The case involving Chantee O. was assigned circuit court case number 2007CF4858. On October 25, 2007, the circuit court granted the State's motion to consolidate the cases.

 In this case, we rely on two different cases with the name "Williams": Williams v. Illinois, 567 U.S._, 132 S. Ct. 2221 (2012), and State v. Williams, 2002 WI 58, 253 Wis. 2d 99, 644 N.W.2d 919. As Williams v. Illinois is much more important to our analysis, it will be referred to as "Williams." We refer to the other case as "State v. Williams."

 In addition to witness testimony, the State introduced exhibits documenting how the evidence for both victims was collected through the testimony of the sexual assault nurse, was transferred from the hospital to the police station through the testimony of the police officers, and was submitted to the SCL through the testimony of the police officers and Witucki. The State did not submit shipping labels showing how the evidence was sent to Orchid and returned to the SCL. However, Witucki testified to the SCL's protocols for maintaining the chain of custody through shipping label manifests and testified that the case numbers on documentation received from Orchid corresponded to the SCL case numbers for Kristina S. and Chantee O.

 The jury trial transcript uses the spelling "electrophoreticgram," although reference sources present it as an "electrophoretogram" which is "[a] record of the results of an electrophoresis." The American Heritage Dictionary of the English Language 594 (3d ed. 1992). "Electrophoresis," in turn, is "[a] method of separating substances, especially proteins, and analyzing molecular structure." Id.

 The State and Deadwiller disagree about the application of two recent U.S. Supreme Court decisions on the Confrontation Clause: Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), and Bullcoming v. New Mexico, 564 U.S._, 131 S. Ct. 2705 (2011). The State argues that both cases are distinguishable, and Deadwiller argues that both are controlling. In Melendez-Diaz, at the defendant's trial for distribution of cocaine, prosecutors introduced into evidence three notarized "certificates of analysis" indicating that test results revealed the distributed substance to be cocaine. 557 U.S. at 308. No analyst testified. Id. at 309. In a straightforward application of Crawford v. Washington, 541 U.S. 36 (2004), the Court held that the certificates were testimonial because they were "quite plainly affidavits" and were "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 310. Indeed, "the sole purpose of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." Id. at 311.
In Bullcoming, at the defendant's DWI trial, the prosecution introduced into evidence a crime lab report completed by Curtis Caylor certifying that, shortly after the traffic accident involving the defendant, Bullcoming's blood-alcohol concentration (BAC) was 0.21 grams per hundred milliliters. 564 U.S. at _, 131 S. Ct. at 2711-12. The prosecution did not call Caylor as *154 a witness because he had been placed "on unpaid leave," but instead, called Gerasimos Razatos, who had not participated in or supervised Caylor's work nor did Razatos have an independent opinion about Bulleoming's BAC. Id. at 2715-16. The Court held that Razatos's substitute testimony did not satisfy the requirements of the Confrontation Clause because the report contained more than machine generated results (for example, that Caylor received the blood sample with the seal intact and that Caylor followed a particular protocol), and that under Melendez-Diaz, the report was testimonial because it was formalized and created solely for an evidentiary purpose. Id. at 2715-17.

 Both cases involve sexual assault. In both cases, the victim underwent a sexual assault examination, which produced vaginal swabs containing DNA of the perpetrator. Police officers in both cases retrieved the evidence, inventoried the evidence, and sent the evidence to the state crime lab, which then sent the evidence to an out-of-state laboratory for DNA testing. Further, the out-of-state laboratories sent back the swabs and a DNA profile of the perpetrator produced from the vaginal swabs. In both cases, state crime lab analysts entered the DNA profile into a DNA database, which resulted in a match to the defendant. When called to testify, the state crime lab analysts reported that the DNA profile sent by the out-of-state lab matched the DNA profile resulting from the DNA database. The DNA profile was not introduced into evidence in either case. Prosecutors in both cases introduced inventory reports and evidence receipts to prove a chain of custody, i.e. that the DNA profile was produced from swabs taken from the victims.

 See Fed. R. Evid. 703:
*157 An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.
See also Wis. Stat. § 907.03.

 To the extent that the facts differ, Witucki's involvement in the DNA testing was more substantial than Lambatos' involvement. After Witucki obtained a match from the database, he obtained a buccal swab from Deadwiller, developed a DNA profile from that swab, and reconfirmed that Deadwiller was a match to the DNA profiles produced by Orchid. Witucki's more substantial involvement in the DNA testing weighs against Deadwiller's argument that Witucki's testimony violated his right to confrontation.

 Deadwiller makes much of Justice Alito's statement that "there would have been a danger of the jury's taking Lambatos[1] testimony as proof that the Cellmark profile was derived from the sample obtained from the victim's vaginal swabs. Absent an evaluation of the risk of juror confusion and careful jury instructions, the testimony could not have gone to the jury." Williams, 567 U.S. at_, 132 S. Ct. at 2236. However, Justice Alito followed that statement by confirming that the Confrontation Clause applies equally to bench and jury trials: "We do not suggest that the Confrontation Clause applies differently depending on the identity of the factfinder. Instead, our point is that the identity of the factfinder makes a big difference in evaluating the likelihood that the factfinder mistakenly based its decision on inadmissible evidence." Id. at 2237 n.4. Similar to Williams, we find no evidence in the record that the jury understood Witucki's testimony to prove the truth of the matter asserted, that Orchid's DNA profiles were produced from the swabs of Kristina S. and Chantee 0. First, the State called several police officers and introduced inventory reports and receipts to prove a chain of custody for the swabs. See supra, ¶¶ 9-12. Second, the jury was given instructions on how to evaluate an expert's testimony: "In determining the credibility of each witness and the weight you give to the testimony of each witness, consider... the opportunity the witness had for observing and knowing the matters the witness testified about.... Ordinarily a witness may testify only about facts, but a witness with expertise in a particular field may give an opinion in that field. So you should consider the qualifications and credibility of the expert, the facts upon which the opinion is based, and the reasons given for the opinion."

 The Supreme Court recently concluded that criminal suspects can be subjected to a DNA test after being arrested and brought to the police station for a serious offense but before they are convicted of the offense. Maryland v. King, 133 S. Ct. 1958 (2013). In reaching that conclusion, the Court highlighted the importance of DNA evidence with respect to solving crimes. Id. at 1966-80.

 Orchid's DNA profiles are not in the record before this court. WTien an appellate record is incomplete with respect to an issue raised by the appellant, we assume that the missing material supports the trial court's ruling. State v. Benton, 2001 WI App 81, ¶ 10, 243 Wis. 2d 54, 625 N.W.2d 923 (citing Duhame v. Duhame, 154 Wis. 2d 258, 269, 453 N.W.2d 149 (Ct. App. 1989)).

 I concur in judgment because the alleged error, if error, was harmless. The record indicates that before trial, the defendant told detectives that he did indeed have sexual relations with the victims, but that the relations were consensual. It is not entirely clear when the defendant made these statements and the detectives did not testify at trial regarding the statements. What is clear is that at the pretrial hearing when the State remarked that the case centered on the issue of consent, the defendant did not object.