COURT OF APPEALS
DECISION
DATED AND FILED

November 19, 2019

Sheila T. Reiff
Clerk of Court of Appeals

## NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP459-CR**

Cir. Ct. No. **2015CF436**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JOSEPH P. PAMONICUTT,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Outagamie County: VINCENT R. BISKUPIC, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Joseph Pamonicutt appeals a judgment, entered upon a jury's verdict, convicting him of one count of aggravated battery and one

count of burglary of a building or dwelling, both counts as a party to the crime. He also appeals an order denying him postconviction relief. Pamonicutt contends that his trial attorney provided ineffective assistance by failing to adequately "safeguard" his constitutional rights to testify in his own defense and to confront a witness against him. We reject his arguments and affirm.

## BACKGROUND

¶2      According to the criminal complaint, on May 26, 2015, Victor[1] was admitted to a hospital with two broken ribs, two broken vertebrae, a broken nose, a cut lip, and contusions and abrasions to both of his eyes. Victor initially told a nurse, Sara Womack, that he suffered his injuries when he fell from a roof. Victor subsequently changed his story, however, and informed a police officer that he was asleep in his bedroom when four people entered his apartment and assaulted him. An eyewitness to the assault identified Pamonicutt as being one of these four men.

¶3      Prior to trial, the State filed a notice of intent to introduce "other acts" evidence against Pamonicutt. As pertinent here, the State's proffered evidence included Facebook messages that were sent from an account bearing Pamonicutt's name to a third party on May 26, 2015, stating: "What up bro..wanna beat up some Mexicans[?]" When the third party questioned why, the account bearing Pamonicutt's name responded: "Fucking with my lil brother."[2]

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2017-18), we use a pseudonym to refer to the victim. All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] It is undisputed on appeal that Victor is of Mexican heritage.

¶4 Three days prior to the start of trial, the circuit court held a hearing on the State's motion. At the hearing, the court determined that the Facebook records were not "other acts" evidence. Rather, the court concluded that they were "part of the context of the case and the panorama of the evidence surrounding the incident or alleged incident." Nonetheless, the court decided to "reserve ruling" on the ultimate admissibility of the records.

¶5 During the same hearing, the State informed the circuit court that it had been unable to serve a subpoena on nurse Womack, whom it had included on its list of trial witnesses. The State explained that the hospital to which Victor had been admitted "had no record of who she was and checked to see if … anybody had married or divorced and changed their name back; and they couldn't figure out who she was."

¶6 At this, Pamonicutt's trial attorney, Michael Petersen, expressed "concern" about Womack's unavailability, because until that morning it was his "understanding that she would be present." Petersen therefore moved for a continuance of the trial. After confirming that the State intended to call one of Victor's treating physicians, Dr. Thomas Winek, the circuit court made the following decision regarding Womack's absence:

> [Victor's] credibility is fair game. The fact that the State hasn't been able to or defense hasn't been able to subpoena this particular witness doesn't exclude the evidence in the Court's view. It's a medical record that fits under the hearsay exceptions of [WIS. STAT. §] 908.03. The State is given notice of its use. The defendant or [Victor] can be cross-examined on it. [Dr. Winek] can be questioned about it, whether on direct or cross, about this historian. So on that particular issue, the Court is going to let this record be utilized in a fairly liberal manner by defense counsel at trial.

¶7 At trial, the State introduced Victor's complete medical records through Winek's testimony. On cross-examination, Petersen elicited testimony from Winek that "[t]he [initial] information that I was given … was that he was on a roof. He had been roofing and had fallen off the roof." Petersen also asked Winek if he "recall[ed] whether there was any information that [Victor] had any fractured ribs in the past?" Winek replied that he "was not aware of that."

¶8 On redirect, Winek stated that "[it] would be difficult to ascertain" how Victor could have suffered his above-described injuries in a fall from a second-story roof. Winek explained that if Victor had fallen from a roof, "I would have expected him to have some injuries to his forearms and upper arms, to try to brace himself from the fall. Also I would be somewhat concerned that he had significant injuries on both his right and left side."

¶9 After Winek was excused, but before he was released from his subpoena, Petersen moved for a mistrial. As grounds, he observed that Womack's treatment notes stated that Victor told her he had fractured his ribs one month prior to his hospital admission. Because Winek had testified that he was not aware of any such patient history, Petersen argued that "at this point we're safer to have a mistrial now and find Ms. Womack, if she exists or doesn't exist."

¶10 The circuit court denied the motion. The court explained that rather than declare a mistrial, it would "allow the doctor to be recalled …. Records have already been received. If there's inconsistencies in those records, they can be brought out. Like I said, I'm going to give liberal cross-examination." Accordingly, Winek was recalled, and he read the relevant portion of Womack's notes to the jury.

¶11 Victor testified that the day before he was assaulted, Aaron Smith (Pamonicutt's brother) and a woman were involved in an altercation during a gathering in Victor's apartment. Victor stated that Smith "started beating on" the woman, which led to Victor telling Smith that "if he felt like hitting someone he could hit a man, not a woman."

¶12 Victor then testified that, after returning home from work the following afternoon, he fell asleep in his bedroom and was woken up by a "kick to [his] face." Victor stated that multiple individuals kicked and punched him repeatedly, and he identified one of his attackers as Pamonicutt. When asked whether he suffered his injuries in a fall from a roof, Victor responded: "Absolutely not."

¶13 On cross-examination, Victor confirmed that he initially told hospital staff that he suffered his injuries in a fall. When asked why he subsequently told law enforcement a different story, Victor stated that he initially "didn't want nobody to get in trouble." He explained, however, that he "changed [his] mind when I talked to my daughter; and she, you know, pretty much begged me to tell the truth."

¶14 Prior to the State resting, the circuit court heard the State's offer of proof regarding the admissibility of the Facebook records. City of Appleton police officer Michael Medina testified that he secured the Facebook records after uploading a warrant authorizing him to search Pamonicutt's Facebook records to a "Facebook for law enforcement website." He stated he had used the same process approximately seventy times to execute similar warrants. After the "search warrant [was] satisfied," Facebook sent Medina a link to download a file with "[m]ost of the messages" associated with Pamonicutt's Facebook account.

5

Medina stated that the downloaded file bore a watermark stating the messages were a "Facebook business record."

¶15     The circuit court ultimately decided against allowing the State to introduce the Facebook records, based upon authentication concerns.  The court explained:

> [A]t least on direct exam of Officer Medina [the court's decision] is to not admit these records at this point because of the failure of Facebook to provide an appropriate certification consistent with our statutes.  There are some indications of trustworthiness, but at this point it's a close call.  At least at this time we are going to defer final ruling on whether it can come in in some other capacity.
>
> For example, if the defendant takes the stand and the State wants to cross-examine him with his entries, ask him some questions about whether he had a Facebook page at that time.  Ask him questions.  Isn't it true at that time, at least during the months leading up to that, you did have a residence in the Fox Lake area?  Any other thing that would confirm the reliability of those records, I think, is fair game on cross-examination of the defendant.

¶16     Pamonicutt did not call any witnesses at trial, and he chose not to testify.  Instead, attorney Petersen argued to the jury that the State had failed to prove beyond a reasonable doubt that Pamonicutt assaulted Victor.  The jury ultimately returned guilty verdicts on both counts.

¶17     Pamonicutt filed a pro se postconviction motion alleging that Petersen rendered ineffective assistance by failing to:  (1) contest the admissibility of the Facebook records on other acts evidence grounds; (2) inform the court that its decision regarding the admissibility of the Facebook records significantly impacted Pamonicutt's decision not to testify; and (3) secure Womack's presence at trial.  Postconviction counsel subsequently appeared for Pamonicutt, and the circuit court held an evidentiary hearing on the motion.

¶18     At the hearing, Petersen testified that when the trial began "the understanding was that Mr. Pamonicutt would testify. However, based upon the Court's ruling on the second day of trial that the Facebook records would not be admitted, unless Mr. Pamonicutt could testify and essentially authenticate them, that's when the decision changed." Petersen also acknowledged that he never informed the circuit court that Pamonicutt's decision not to testify was driven primarily by the court's decision regarding the admissibility of the Facebook records.

¶19     Petersen further testified that he did not subpoena Womack because it was his "understanding the State was going to subpoena her. She was on the State's witness list." However, once he was informed that the State could not locate Womack, he testified that he "made efforts to try to contact the … hospital … to try to find Ms. Womack. When I called, I was given—I was given information that they couldn't confirm that she worked there. So I was unable to find her." In addition, Petersen stated that although it "would have been beneficial to find her a few days before trial[,] in my position she had already given a statement within the medical records."

¶20     The circuit court denied Pamonicutt's postconviction motion in a written order. The court concluded that Petersen did not perform deficiently in any respect and that, even if he had, Pamonicutt had not shown that he was prejudiced by any assumed deficiency. Pamonicutt now appeals.

**DISCUSSION**

¶21     On appeal, Pamonicutt contends that Petersen was ineffective by failing to "safeguard": (1) "Pamonicutt's constitutional right to testify from being snuffed by the looming threat to admit otherwise inadmissible 'other acts'

evidence"; and (2) "Pamonicutt's constitutional right to confront [a] medical witness directly related to issues concerning the victim's credibility." Whether an attorney provided ineffective assistance is a mixed question of fact and law. *State v. Carter*, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695. We will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* However, the ultimate determination of whether counsel's assistance was ineffective is a question of law that we review independently. *Id.*

¶22 To prevail on an ineffective assistance claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If a defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other. *Id.* at 697. In this case, because we conclude that Petersen did not perform deficiently in any respect, we only address the first prong.

¶23 To demonstrate deficient performance, a defendant must show that his or her trial counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. *Carter*, 324 Wis. 2d 640, ¶22. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* Accordingly, we are highly deferential to counsel's strategic trial decisions. *State v. Breitzman*, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93. As such, we will not second-guess a reasonable trial strategy, unless that strategy was based on an irrational trial tactic or based upon caprice rather than upon judgment. *Id.*

¶24 We begin with Pamonicutt's argument that Petersen failed to adequately safeguard his right to testify. The right to testify on one's own behalf

in defense to a criminal charge is a fundamental constitutional right. *State v. Arredondo*, 2004 WI App 7, ¶11, 269 Wis. 2d 369, 674 N.W.2d 647 (2003). A defendant may, however, knowingly and voluntarily waive the right. *Id.*

¶25    As indicated, Pamonicutt argues that Petersen was deficient because he failed to adequately address the circuit court's "looming threat to allow the uncertified inadmissible Facebook evidence" to be introduced into evidence if Pamonicutt chose to testify. He fails, however, to develop any argument as to why the court's decision regarding the admissibility of the Facebook records was an erroneous exercise of discretion. *See State v. Monahan*, 2018 WI 80, ¶30, 383 Wis. 2d 100, 913 N.W.2d 894 ("Circuit court evidentiary decisions are reviewed for an erroneous exercise of discretion."). Instead, he deems the merits of the court's decision on the ultimate admissibility of that evidence "insignificant." (Blue 11)

¶26    We cannot agree with Pamonicutt that the merits of the circuit court's evidentiary decision are insignificant. As he concedes, a "battle was won for the defense when the [circuit] court deemed the Facebook records inadmissible [during the State's case-in-chief] for lack of certification."[3] Consequently, when Petersen advised Pamonicutt not to testify so as to avoid opening the door for the State to, in the words of the circuit court, "confirm the reliability of those records"

---

[3] Again, the Facebook records corroborated Victor's version of events insomuch as they portrayed a Facebook user named Joseph Pamonicutt messaging a third party to ask: "What up bro..wanna beat up some Mexicans[?]" When the third party questioned why, the account bearing Pamonicutt's name responded: "Fucking with my lil brother."

(i.e., to authenticate the records and thus render them admissible), he was providing Pamonicutt sound legal advice.[4]

¶27    This conclusion follows because, absent any developed argument that the circuit court's statement that Pamonicutt's testimony could potentially authenticate the Facebook records was in error, we must accept that there was, in fact, a risk that if Pamonicutt chose to testify, the Facebook records would be entered into evidence.  We cannot conclude that Petersen performed deficiently by advising Pamonicutt of that risk and by recommending that he avoid it by declining to testify.

¶28    Instead, we agree with the State that Petersen merely presented Pamonicutt with information that allowed him to make the same choice that all defendants routinely make:  choose to take the stand and waive his privilege to be free from the full scope of cross-examination permissible under the rules of evidence or choose not to testify and put the State to its burden to prove him guilty.  *See Neely v. State*, 97 Wis. 2d 38, 45, 292 N.W.2d 859 (1980).  By doing

---

[4] At the postconviction evidentiary hearing, Petersen gave the following relevant testimony in response to questioning from the State:

> Q  What did you advise Mr. Pamonicutt, if you recall?  To testify
> or not?
>
> A  I would have—I told him not to testify based upon the issues
> of the Facebook posting.
>
> ….
>
> Q  Was that a strategic decision?
>
> A  Of course, yes.

so, we conclude that Petersen provided Pamonicutt with representation that fell well within the wide scope of reasonable professional assistance.

¶29 Pamonicutt next argues that Petersen failed to adequately safeguard his right to confront a witness against him because Petersen failed to "interview or locate Nurse Womack through a private investigator prior to the State's reveal that she could not be found." In all criminal prosecutions, defendants have a right, under the Confrontation Clause of the Sixth Amendment, to be confronted with the witnesses against them. *State v. Deadwiller*, 2013 WI 75, ¶20, 350 Wis. 2d 138, 834 N.W.2d 362.

¶30 Accordingly, the admission of testimonial statements from witnesses not present at trial is appropriate only when the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the absent witness. *Id.* "The Confrontation Clause is concerned with 'a specific type of out-of-court statement,' such as affidavits, depositions, custodial examinations, prior testimony, and 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Id.* (citation omitted).

¶31 As with his argument concerning Petersen's alleged deficiency in regards to the admissibility of the Facebook records, Pamonicutt once again fails to address the underlying merit of the circuit court's decision to allow Womack's out-of-court statements to be introduced into evidence. That is, Pamonicutt fails to explain how any of the statements attributed to Womack could be considered the

"specific type of out-of-court statement" that implicates the protections of the Confrontation Clause.[5]

¶32     Regardless, Pamonicutt's claim of ineffective assistance related to Petersen's failure to secure Womack's presence at trial fails for a more straightforward reason: his claim is purely speculative. *See State v. O'Brien*, 214 Wis. 2d 328, 349-50, 572 N.W.2d 870 (Ct. App. 1997) (holding that speculation cannot be a basis for an ineffective assistance of trial counsel claim). Put simply, Pamonicutt faults Petersen for not locating Womack prior to trial without establishing that additional efforts on the part of Petersen would have actually enabled him to find her.

¶33     Again, Pamonicutt argues Petersen performed deficiently because he failed to "interview or locate Nurse Womack through a private investigator prior to the State's reveal that she could not be found." In so arguing, however, he ignores the fact that the State's attempts to locate Womack also proved unsuccessful. He also fails to recognize the importance of the circuit court's factual finding that Petersen "made effort to find Ms. Womack but was not successful."[6]

¶34     As a result, Pamonicutt's argument regarding Petersen's alleged deficient performance is purely speculative—because he does not explain why or

---

[5] We also note that Petersen did, in fact, object to the introduction of Womack's out-of-court statements and move for both a continuance and a mistrial based upon the introduction of those statements.

[6] Although Pamonicutt appears to question the veracity of Petersen's testimony that he tried to locate Womack prior to trial, he presents no developed argument explaining why the court's factual finding was clearly erroneous. We therefore accept that finding, as we must. *See State v. Carter*, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695.

how a private investigator would have succeeded in locating Womack when both the State and Petersen were unable to do so. Thus, on this record, we conclude that Petersen's representation fell within the wide range of reasonable professional assistance, and he therefore did not perform deficiently.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.