# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP2187-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| | Plaintiff-Respondent-Cross-Appellant, |
| | v. |
| | Kyle Lee Monahan, |
| | Defendant-Appellant-Cross-Respondent-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 375 Wis. 2d 796, 899 N.W.2d 737
(2017 – unpublished)

| | |
|---|---|
| OPINION FILED: | June 28, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 14, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Lafayette |
| JUDGE: | William D. Johnston |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | R.G. BRADLEY, J., dissents, joined by ABRAHAMSON, J., and A.W. BRADLEY, J. (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-cross-respondent-petitioner, there were briefs filed and an oral argument by *Andrew R. Hinkel*, assistant state public defender.

For the plaintiff-respondent-cross-appellant, there was a brief filed and an oral argument by *Jeffrey J. Kassel*, assistant attorney general, with whom on the brief was *Brad D. Schimel*, attorney general.

An amicus curiae brief was filed on behalf of Wisconsin Association of Criminal Defense Lawyers by *Robert R. Henak* and *Henak Law Office*, *S.C.*, Milwaukee.

No. 2014AP2187-CR
(L.C. No. 2012CF72)

STATE OF WISCONSIN : IN SUPREME COURT

State of Wisconsin,

     Plaintiff-Respondent-Cross-Appellant,

  v.

Kyle Lee Monahan,

     Defendant-Appellant-Cross-Respondent-Petitioner.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**JUN 28, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 MICHAEL J. GABLEMAN, J. This is a review of an unpublished, authored decision of the court of appeals affirming the Lafayette County Circuit Court's[1] judgment of conviction

---

[1] The Honorable William D. Johnston, presiding.

against Kyle Lee Monahan.[2]  State v. Monahan, No. 2014AP2187-CR, unpublished slip op. (Wis. Ct. App. Apr. 27, 2017).  Monahan raises a single issue for our review:  was the erroneous exclusion of data from a portable GPS unit harmless?

¶2  We hold that the circuit court's erroneous exclusion of the GPS data was harmless, and therefore affirm the decision of the court of appeals.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

¶3  Monahan was involved in a single-vehicle crash that took place on August 20, 2011, in Shullsburg, Wisconsin.  As a result of this crash, Monahan was seriously injured and his girlfriend, R.C., who was also in the vehicle, was killed.  The State subsequently charged Monahan with three counts of criminal conduct:  (1) homicide by intoxicated use of a motor vehicle contrary to Wis. Stat. § 940.09(1)(a) (2011-12)[3]; (2) homicide by

---

[2] The court of appeals also reversed a circuit court order granting Monahan's postconviction motion to relieve Monahan from paying the DNA surcharge.  State v. Monahan, No. 2014AP2187-CR, unpublished slip op., ¶56 (Wis. Ct. App. Apr. 27, 2017).  Monahan states in his petition for review that he does not raise this issue for our review.  Accordingly, we do not consider it further.  See State v. Sulla, 2016 WI 46, ¶7 n.5, 369 Wis. 2d 225, 880 N.W.2d 659 (quoting Jankee v. Clark Cty., 2000 WI 64, ¶7, 235 Wis. 2d 700, 612 N.W.2d 297) ("If an issue is not raised in the petition for review or in a cross petition, 'the issue is not before us.'").

[3] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

intoxicated use of a vehicle contrary to § 940.09(1)(b)[4]; and (3) homicide by negligent operation of a vehicle contrary to Wis. Stat. § 940.10(1). The only factual dispute at trial was whether it was Monahan or R.C. who was driving at the time of the crash.

¶4 Monahan and R.C. met in early summer 2011 and started dating shortly thereafter. R.C. worked as a nanny in the Chicago suburb of Glenview, and she would often drive to Shullsburg on weekends to visit Monahan. The crash occurred during one such weekend.

¶5 R.C. arrived in Shullsburg at approximately 12:30 p.m. on Saturday, August 20, 2011. The couple engaged in several social activities during the course of that day. One such event was a birthday party for Monahan's cousin, which was held at that cousin's farm. Monahan and R.C. arrived at the farm in R.C.'s Saab 9-5 station wagon at approximately 6:30 p.m. Monahan and R.C. each had a couple drinks, but left approximately 45 minutes later at about 7:15 p.m. because R.C.

---

[4] Though count one and two have the same title, they are based on different statutory provisions. Count one prohibits "[c]aus[ing] the death of another by operation or handling of a vehicle while under the influence of an intoxicant." Wis. Stat. § 940.09(1)(a). Count two prohibits "[c]aus[ing] the death of another by the operation or handling of a vehicle while the person has a prohibited alcohol concentration . . . ." § 940.09(1)(b). See also infra note 9.

was exhausted from the day.[5]  Multiple eyewitnesses testified that Monahan was in the passenger seat when he left in the Saab with R.C.

¶6  After leaving the party, the Saab experienced a catastrophic rollover event.  Both Monahan and R.C. were ejected from the vehicle.  At the scene, emergency personnel asked Monahan multiple times how many people were in the Saab in order to ensure there were no others to be found (first responders were especially concerned by an empty child seat they found in the back of the Saab, which R.C. kept in her vehicle due to her job as a nanny).

¶7  Multiple emergency personnel asked Monahan who was driving.  To each, he initially stated that he did not know, but then stated that he probably was the driver.[6]  Throughout the

---

[5] Between the time R.C. arrived in Shullsburg and the start of the party, Monahan and R.C. had socialized at his home and a local restaurant, and assisted his cousin in preparing for the party.

[6] While Monahan was still lying on the ground after the crash, he told Shullsburg firefighter Timothy Corley "I was driving, I guess."

After Monahan was placed on a backboard at the side of the road, Lafayette County Sheriff's Deputy Paul Klang walked towards him to question him.  While walking towards Monahan, Deputy Klang heard him say "that is the last time I will drink and drive."  When Deputy Klang questioned Monahan directly, Monahan did not remember who was driving.  After being informed a female was also in the vehicle, Monahan said "I was probably driving, then."

(continued)

4

following several hours, Monahan's recollection of who had been driving at the time of the crash continued to evolve, eventually adhering to the conclusion that he, in fact, had been the driver. While in a medical helicopter on the way to the hospital, Monahan unequivocally stated that he was driving the Saab. At the hospital, after undergoing emergency surgery, Monahan——unprompted——asked for a pen and pad of paper and wrote that he remembered the accident and that he had been driving. However, on January 13, 2012, while signing a DNA sample consent form, Monahan told Wisconsin State Trooper Ryan Zukowski, "[i]t doesn't matter, you know, I wasn't driving." Ten months after the accident, in July 2012, Monahan told Wisconsin State Trooper Thomas Parrott "[i]t's not like I meant [it to] F'ing happen." At trial, Monahan testified that he did not remember the accident and did not remember ever admitting that he was the driver.

¶8 The State and Monahan engaged their own respective experts. Trooper Parrott prepared a report and testified on

---

After Monahan was moved to a gurney, while being treated by EMS personnel, Lafayette County Sheriff's Deputy Michael Gorham asked Monahan who was driving. Monahan responded, "I don't know, I might have been." Shortly after this exchange, Deputy Gorham returned with a digital recorder at the instruction of Lafayette County Sheriff's Sergeant Darrell Morrissey. Deputy Gorham again asked Monahan, "were you the driver?" Monahan responded, "yeah, I guess." After informing Monahan that a firefighter reported seeing Monahan driving the car out of Shullsburg, Deputy Gorham asked Monahan "so you were the driver?" Monahan responded "yeah." Gorham followed up "you were?" Monahan again responded "yeah."

5

behalf of the State. Paul Erdtmann, a Licensed Professional Engineer, prepared a report and testified on behalf of Monahan.

¶9 Erdtmann and Trooper Parrott both came to some of the same conclusions. Both experts agreed that the Saab was traveling between approximately 87 and 100 miles per hour when the crash sequence began. The crash sequence began when the Saab's wheels left the pavement and fell onto the grassy shoulder. After leaving the pavement, the Saab "furrowed" towards the passenger's side——that is, the Saab moved sideways through the grassy shoulder area such that the passenger's side (and not the front) of the Saab was leading the path of travel. The Saab went airborne after "tripping" on something on the shoulder and rolled multiple times with the passenger's side leading the rolls.

¶10 Both experts also agreed that at the time of the crash, the passenger's side window was open, the sunroof was open, the driver's side window was closed, neither occupant wore their seatbelt, and both occupants were ejected from the Saab. The experts further agreed that R.C. had been ejected from the vehicle before Monahan based on each occupant's resting position at the crash scene.

¶11 The two experts disagreed, however, as to the ultimate conclusion to be drawn from the physical evidence. Trooper Parrott concluded that Monahan was the driver. He based this conclusion on a number of pieces of physical evidence. First, the amount of dirt on both R.C. and Monahan's clothing indicated that R.C. had been in the passenger's seat. R.C.'s clothes were

covered in dirt; conversely, Monahan's clothes were relatively clean. This indicated to Trooper Parrott that R.C. was in the passenger's seat because the Saab would have kicked up substantial amounts of dirt that would have entered the vehicle through the open passenger's side window. Further, the passenger's side windowsill had an area where the dirt was rubbed off. Based on the amount of dirt on each occupant's clothing, Trooper Parrott concluded that R.C. rubbed the dirt off the windowsill while she exited the Saab.

¶12 Next, Trooper Parrott testified that the physics of the crash showed that R.C. had been ejected through the open passenger's side window, making it likely she had been seated in the passenger's seat and not the driver's seat at the time of the crash. He further testified that the positions of the driver's seat and front passenger's seat in the Saab indicated that Monahan was driving.

¶13 Finally, Trooper Parrott testified that the driver's side airbag was covered in blood. Analysts at the State Crime Lab found Monahan's DNA in this blood. Analysts found a second DNA profile in the blood, but it was insufficient for identification. This indicated that Monahan had to be in the driver's seat, as his blood would not have covered the airbag had he been in the passenger's seat.

¶14 On the other hand, Erdtmann testified that he could not determine, to a reasonable degree of engineering certainty, who had been driving at the time of the accident. He agreed with Trooper Parrott that R.C. had been ejected first, but he

concluded that R.C. could have been ejected through the open sunroof and therefore could have been the driver. He testified that it was equally likely that R.C. was ejected through the sunroof from the driver's seat as it was that she was ejected through the passenger's side window from the passenger's seat.

¶15 In regard to the seat positions, Erdtmann conducted a test on an exemplar Saab that was the same model and year as R.C.'s. He placed the seats in the exact positions at which they were found after the crash. He then found individuals to serve as models who were approximately the same height and weight as Monahan and R.C. The R.C. model was able to reach the pedals and steering wheel from the driver's seat with no "physical constraints." The Monahan model was able to "comfortably" sit in the passenger's seat. On rebuttal, the State offered the testimony of R.C.'s mother, who testified that R.C. "would always have her seat as close up to the steering wheel as she possibly could" and that the R.C. model was "much farther back than [R.C.] would have been."

¶16 Erdtmann also testified that he inferred that the second DNA profile found on the driver's side airbag was R.C.'s. He testified that, given the jostling that occurred inside the Saab while it was rolling, the DNA was inconclusive as to seat position——meaning that Monahan's DNA could have fallen on the driver's side airbag from the passenger's seat when the Saab was rolling.

¶17 It is against this factual backdrop that we come to the evidentiary crux of this matter——the erroneously excluded

GPS data. R.C. owned a portable GPS unit that she kept in the Saab. The GPS unit recorded timestamped coordinates when it was powered on. This allowed both Erdtmann and Trooper Parrott to recreate the Saab's movements and calculate its speed on the date of the accident.

¶18 The data extracted from the GPS unit for the trip commencing at approximately 7:15 p.m. on August 20, 2011, from the farm to the crash site showed that the Saab was driving at a high rate of speed——sometimes in excess of 100 miles per hour—— after leaving the farm. It also showed that after leaving the farm, the Saab stopped for approximately two minutes in downtown Shullsburg before resuming the trip. Neither party presented any direct evidence as to what happened during this stop. After resuming the trip, the Saab again traveled at a high rate of speed——again sometimes exceeding 100 miles per hour——during the time period between the two-minute stop and the crash.

¶19 Both the State and Monahan filed pretrial motions regarding the GPS data for the portion of the trip between the farm and the two-minute stop. Monahan moved for its admission, intending to use the GPS data of the entire trip between the farm and the crash to show that the same person was likely driving both before and after the stop in Shullsburg. He based this argument on the fact that the GPS data revealed similar driving patterns both before and after the stop. He reasoned that combined with eyewitness testimony that R.C. was driving when the pair left the farm, the jury could reasonably conclude that R.C. was driving at the time of the crash.

9

¶20 The State opposed admission of the GPS data detailing the portion of the trip between the farm and Shullsburg, arguing that only the GPS data of the segment between Shullsburg and the crash should be admitted. The State argued that admitting the GPS data relating to the trip between the farm and Shullsburg would constitute other acts evidence used to show propensity. See Wis. Stat. § 904.04(2).[7] The State argued that, if Monahan's motion was granted, the GPS data would be improperly used to show that R.C. had a propensity for driving above the speed limit, and thus must have been driving at the time of the crash. See id.

¶21 The circuit court denied Monahan's motion and admitted only the GPS data relating to the period of time between the

---

[7] Wisconsin Stat. § 904.04(2) states, in relevant part: "[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith."

two-minute stop in Shullsburg and the crash.[8] This ruling reflected the circuit court's determination that the GPS data between the farm and two-minute stop constituted other acts evidence offered to show R.C.'s propensity for driving fast. In the circuit court's view, the continuum of relevant events leading to the crash started at the two-minute stop, not the farm.

¶22 Although the GPS data relating to the time period between the two-minute stop and the crash was admitted, it did not become the centerpiece of either party's case. In fact, after its introduction into evidence, it was not discussed again

---

[8] The pretrial motions filed by Monahan and the State also addressed GPS data that would show the Saab traveled at a high rate of speed on the way to the farm; a period during which the parties agree R.C. was driving. The circuit court excluded this GPS data for the same reasons it excluded the GPS data of the trip between the farm and Shullsburg. The extent to which Monahan appeals exclusion of the trip to the farm is unclear——at various points in briefing, he appears to challenge only the exclusion of the trip from the farm to Shullsburg, but at other points, he appears to also challenge the exclusion of the trip to the farm. The scope of the State's confession of error is similarly unclear. In its brief to the court of appeals——the first point at which the State confessed error in this case——the State conceded error only as to the trip between the farm and Shullsburg. However, other areas of briefing and oral arguments to this court indicate that the State may also confess error as to the trip to the farm. Neither party offers analysis of the trip to the farm separate from its analysis of the trip from the farm to Shullsburg.

We determine that separately addressing the exclusion of the GPS data relating to the trip to the farm is unnecessary because our analysis and holding would remain the same even if we assumed error regarding that trip.

until the State's closing argument.  In closing argument, the State asserted that it did not "make sense that a young girl who doesn't know the area is driving on some rural road and driving, no less, after she'd been drinking[,] and at speeds of 40 to 50 miles per hour over the speed limit[.]   That doesn't make sense."

¶23  The jury returned verdicts of guilty as to all three counts.[9]

¶24 Monahan appealed, arguing that the circuit court erroneously excluded the GPS data relating to the time period between the farm and the two-minute stop in Shullsburg.   The State conceded——and the court of appeals accepted for purposes of appeal——that the circuit court's exclusion of the GPS data

---

[9]  The circuit court dismissed count two by operation of Wis. Stat. § 940.09(1m), which states in relevant part:  "[a] person may be charged with and a prosecutor may proceed upon an information based upon a violation of any combination of sub. (1)(a) . . . or (b) . . . for acts arising out of the same incident or occurrence. . . .   If the person is found guilty of more than one of the crimes so charged for acts arising out of the same incident or occurrence, there shall be a single conviction for purposes of sentencing . . . ."   The circuit court dismissed count three by operation of Wis. Stat. § 939.66(2), which states, in relevant part:   "[u]pon prosecution for a crime, the actor may be conviction of either the crime charged or an included crime, but not both.   An included crime may be . . . [a] crime which is a less serious type of criminal homicide than the one charged."

was erroneous.[10] Monahan, 2014AP2187-CR, ¶2. However, the court of appeals concluded that the error was harmless. Id. In explaining its conclusion, the court of appeals emphasized the strength of the State's case. Id., ¶17.

¶25 First, the court of appeals noted that Monahan's many admissions that he had been driving at the time the accident provided strong evidence for the State. Id., ¶¶19-26.

¶26 Next, the court of appeals noted that Monahan had never substantially contradicted Trooper Parrott's testimony that Monahan had been the driver. Id., ¶33. The court observed that Erdtmann testified that "it was possible that either Monahan or R.C. was the driver." Id, ¶37. It further observed that Erdtmann's testimony regarding his exemplar of the vehicle's seats and his conclusions therefrom had been rebutted by the testimony of R.C.'s mother, which would have allowed the jury to accept Trooper Parrott's reconstruction. Id., ¶¶38-39.

¶27 Finally, the court of appeals chastised the State for exploiting the excluded GPS data in closing argument. Id., ¶29. However, it concluded that the State's discussion was harmless because its argument concerning the excluded evidence comprised

---

[10] The State agreed with Monahan that "[t]he vehicle's speed after it left the cousin's residence was not other acts evidence[,] but part of the continuum of facts relevant to the crime" pursuant to State v. Dukes, 2007 WI App 175, ¶28, 303 Wis. 2d 208, 736 N.W.2d 515. The court of appeals did not "weigh in on whether the [circuit] court erroneously excluded the GPS data," but rather accepted the State's concession for purposes of the appeal. Monahan, 2014AP2187-CR, ¶2.

13

an aggregate of five sentences out of approximately 70 transcript pages of closing argument. Id.

¶28 The court of appeals determined that "even if the jury heard the excluded GPS data evidence, the GPS data would have paled in comparison to the strong evidence that Monahan was driving at the time of the accident." Id., ¶40. Consequently, the court of appeals saw "no reason to think that, in light of all the evidence that Monahan was the driver, admission of the excluded evidence would have changed the outcome of this case." Id.

¶29 Monahan petitioned this court for review, which we granted on November 13, 2017.

## II.  STANDARD OF REVIEW

¶30 Circuit court evidentiary decisions are reviewed for an erroneous exercise of discretion. State v. Hunt, 2014 WI 102, ¶20, 360 Wis. 2d 576, 851 N.W.2d 434. However, in this case, the State concedes that the circuit court erroneously exercised its discretion in excluding the GPS data from the farm to the two-minute stop.[11]

¶31 Whether a circuit court's erroneous exclusion of evidence is harmless is a question of law we review de novo. Id., ¶21.

---

[11] We are not bound by a party's concession of law. State v. Anderson, 2014 WI 93, ¶19, 357 Wis. 2d 337, 851 N.W.2d 760. For purposes of this opinion, however, we assume without deciding that the circuit court's exclusion of the GPS data was erroneous.

14

III. ANALYSIS

¶32 We first set forth and discuss the harmless error rule. We next apply the rule to Monahan. We then hold that the circuit court's erroneous exclusion of the GPS data was harmless, and consequently affirm the decision of the court of appeals.

A. The Harmless Error Rule

¶33 An erroneous evidentiary ruling is reversible only if "a substantial right of the party is affected." Wis. Stat. § 901.03(1). We construe this to mean that an error is harmless if the party benefitted by the error shows "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Hunt, 360 Wis. 2d 576, ¶26 (quoting State v. Harris, 2008 WI 15, ¶42, 307 Wis. 2d 555, 745 N.W.2d 397). In the present case, the State has the burden to prove "beyond a reasonable doubt that a rational jury would have found [Monahan] guilty absent the error." Id. (quoting State v. Harvey, 2002 WI 93, ¶49, 254 Wis. 2d 442, 647 N.W.2d 189).

¶34 The harmless error rule originated in response to the perception that appellate courts were "applying a rule approximating automatic reversal" when trial error was found. John M. Greabe, The Riddle of Harmless Error Revisited, 54 Hous. L. Rev. 59, 67 (2016); see also 7 Wayne R. LaFave, et al., Crim. Proc. § 27.6(a) (4th ed. 2017). The United States Supreme Court aptly described the problem: "So great was the threat of reversal, in many jurisdictions, that criminal trial became a game for sowing reversible error in the record, only to have

15

repeated the same matching of wits when a new trial had been thus obtained." Kotteakos v. U.S., 328 U.S. 750, 759 (1946). The goal of the harmless error rule is to "inject reasoned judgment . . . into appellate review" to ensure retrials occur only when the error actually affected the original trial. Id. at 759-60; see also Harry T. Edwards, To Err is Human, but not Always Harmless:  When Should Legal Error be Tolerated?, 70 N.Y.U. L. Rev. 1167, 1174 (1995).

¶35 We use several non-exclusive factors to aid our application of the harmless error rule in the evidentiary context:  (1) the frequency of the error; (2) the importance of the erroneously included or excluded evidence to the prosecution's or defense's case; (3) the presence or absence of evidence corroborating or contradicting the erroneously included or excluded evidence; (4) whether erroneously excluded evidence merely duplicates untainted evidence; (5) the nature of the defense; (6) the nature of the State's case; and (7) the overall strength of the State's case. State v. Martin, 2012 WI 96, ¶46, 343 Wis. 2d 278, 816 N.W.2d 270; State v. Norman, 2003 WI 72, ¶48, 262 Wis. 2d 506, 664 N.W.2d 97; see also Hunt, 360 Wis. 2d 576, ¶27; State v. Nelson, 2014 WI 70, ¶46, 355 Wis. 2d 722, 849 N.W.2d 317.

### B.   Application to Monahan

### 1.   Frequency of the error

¶36 This factor requires us to consider whether the error scarcely appeared in the record or pervaded it.  Martin, 343 Wis. 2d 278, ¶47.  An error that pervades the record is more

likely to be harmful than an error that appears only a few times, though an error may be so prejudicial that reversal is required despite appearing in the record only once. See id.; see also United States v. Impson, 531 F.2d 274, 278 (5th Cir. 1976).

¶37 In this case, the error manifested in the record once. The GPS data was not a centerpiece of the State's case, but rather was mentioned only briefly in closing argument, when the State argued that it did not make sense that a driver who was unfamiliar with the area would operate a vehicle at the speed the Saab was traveling at the time of the crash. While the excluded GPS data would have undoubtedly undercut this argument because it would have allowed the jury to conclude that R.C. had, in fact, been operating the Saab at a high rate of speed over (presumptively) unfamiliar roadways, the argument was not central to the State's theory of the case. The State's theory of the case rested on Trooper Parrott's crash reconstruction; the argument that R.C. would not have driven so recklessly given her unfamiliarity with the area constituted a miniscule percentage of a 70-page closing argument transcript.[12]

---

[12] The court of appeals considered five sentences in the State's closing argument to be objectionable. Monahan, 2014AP2187-CR, ¶29; see also infra, ¶27. Depending on how one classifies certain sentences in the State's closing argument, the objectionable portion of the State's closing argument could constitute up to three paragraphs or 24 lines of the transcript. See dissent, ¶3. This would add up to approximately one full page of transcript (the transcript pages from closing arguments contain 25 lines of text each) out of 70 pages of closing arguments, or approximately 1.4 percent.

¶38 This is in contrast to Martin, where erroneously-admitted testimony constituted the bulk of the State's case. Id. The testimony was "discussed at length in both the State's opening statement and closing argument." Id. The error was repeated often in the record and was "the backbone of the State's argument." Id. The extent to which the State relied upon the excluded GPS data in the present case simply did not rise anywhere close to that level of repetition, duration, or extent. We conclude that this factor weighs in favor of the State.

2. Importance of the erroneously excluded evidence

¶39 This factor considers the extent to which the excluded evidence impacted the verdict. Hunt, 360 Wis. 2d 576, ¶29; Nelson, 355 Wis. 2d 722, ¶47; see also Martin, 343 Wis. 2d 278, ¶51. Exclusion of evidence that would go to the foundation of the verdict is less likely to be harmless than exclusion of evidence that would have little impact on the verdict. See Martin, 343 Wis. 2d 278, ¶51.

¶40 The excluded GPS data did not go to the foundation of the verdict. Rather, the excluded GPS data is direct evidence of a fact that is not of consequence: how fast the Saab was traveling between the farm and the two-minute stop. Given the other evidence presented——and emphasized——by the parties, the GPS data would have been largely inconsequential to the verdict.

¶41 Hunt, while factually disparate, is instructive on this question. 360 Wis. 2d 576. In that case, the defendant, Hunt, was convicted of causing a child under 13 to view or

18

listen to sexual activity based on an incident in which Hunt showed his adopted daughter a video of sexual intercourse. Id., ¶¶1-2, 4. At the preliminary hearing, the victim testified that Hunt referred to the video as stuff that he received from a certain friend, Venske. Id., ¶5. Hunt admitted that the victim may have seen an image of a testicular hernia sent by Venske, but denied ever showing the victim a video of sexual intercourse. Id., ¶8. Hunt argued that the victim embellished the story due to an ongoing custody dispute. Id., ¶9.

¶42 Consistent with that defense, Hunt proffered testimony from Venske that he sent Hunt an image of a testicular hernia, but never sent Hunt a video of sexual intercourse. Id., ¶12. The circuit court excluded Venske's testimony. Id., ¶13. We held that the circuit court erroneously exercised its discretion when it excluded Venske's testimony because the testimony would have corroborated Hunt's testimony. Id., ¶25. We held the error to be harmless, however, because the source of the sexually explicit content was not an element of the crime. Id., ¶30. Stated differently, the excluded testimony did not go to the foundation of the verdict because it would have demonstrated a fact that was irrelevant to the crime charged. See id., ¶34.

¶43 Similarly, in the present case, the excluded GPS data would have bolstered Monahan's contention that R.C. may have been driving the Saab at the time it crashed. For this reason, excluding that portion of the GPS data was error. See id., ¶29. Establishing that the evidence was admissible does not, of course, answer the harmless error question. Id. Though the

19

excluded GPS data should have been admitted, it nonetheless did not impact the verdict because it bears little relation to the elements of homicide by intoxicated use of vehicle. See Wis. Stat. § 940.09(1)(a).[13] Because neither the speed of the Saab between the farm and two-minute stop, nor who was driving it during that time period, were "required element[s] of the State's case, the value of [the excluded GPS data] lay solely in its potential to corroborate [Monahan]'s version of events." Hunt, 360 Wis. 2d 576, ¶34.

¶44 Thus, while the excluded GPS data may have added some credibility to Monahan's defense, it was not a fact that was important to the verdict. Accordingly, we conclude that this factor weighs in favor of the State.

### 3. The presence or absence of evidence corroborating or contradicting the erroneously excluded evidence

¶45 This factor is closely related to the preceding one, the importance of the erroneously excluded evidence. Hunt, 360 Wis. 2d 576, ¶30. If other evidence demonstrates what the excluded GPS data was offered to show, or if the excluded GPS data would not contradict any of the State's evidence, then its erroneous exclusion is more likely harmless. See Martin, 343 Wis. 2d 278, ¶54.

---

[13] A person commits homicide by intoxicated use of a vehicle if he "[1] causes the death of another [2] by the operation or handling of a vehicle [3] while under the influence of an intoxicant." Wis. Stat. § 940.09(1)(a).

20

¶46 The excluded GPS data was neither corroborated nor contradicted because no other evidence was admitted to establish the speed of the vehicle between the farm and the two-minute stop.   Again, Hunt is helpful to our understanding of the application of this factor.   360 Wis. 2d 576.   In Hunt, Venske's excluded testimony did not contradict any of the State's evidence because the State did not offer any evidence of the source of the sexually explicit video.   Id., ¶33.   In holding the error harmless, we reasoned that "the excluded evidence . . . would not have served to weaken the State's case on the issue of where Hunt obtained the sexually explicit video, because the State never alleged it was sent by Venske."   Id.   A similar reasoning applies here:   the excluded GPS data would not have served to weaken the State's case on the issue of how fast the Saab was traveling between the farm and the two-minute stop because the State never alleged that the Saab was speeding during that segment.   Consequently, this factor weighs in favor of the State.

### 4.   Whether the erroneously excluded evidence duplicates untainted evidence.

¶47 This factor reflects our understanding that the error is more likely harmless if the excluded evidence would serve only to duplicate admitted evidence.   Nelson, 355 Wis. 2d 722, ¶50.   Conversely, if the erroneously excluded evidence would have been the only evidence to support a factual finding by the jury, then the error is more likely prejudicial.   See Martin, 343 Wis. 2d 278, ¶57.

21

¶48 Literal application of this factor leads us to observe that the GPS data does not duplicate any evidence because no other evidence regarding the speed of the Saab between the farm and two-minute stop was offered. The State did not offer any evidence as to either how fast the Saab was traveling or who was driving it between the farm and two-minute stop. Conversely, Monahan offered evidence in the form of eyewitness testimony that R.C. was driving when the couple left the farm. The excluded GPS data, had it been admitted, would have constituted circumstantial evidence that the same person was driving both before and after the two-minute stop. While the excluded GPS data would have fractionally overlapped with the eyewitness testimony, we cannot say that the erroneously excluded GPS data would have duplicated the eyewitness testimony——or any other untainted evidence. The result of our consideration is that this factor weighs in favor of Monahan.

### 5. The nature of the defense

¶49 If the erroneously excluded evidence closely fits the defense theory of the case, then its exclusion is more likely prejudicial. See State v. Deadwiller, 2013 WI 75, ¶43, 350 Wis. 2d 138, 834 N.W.2d 362; see also Martin, 343 Wis. 2d 278, ¶59. Conversely, if the erroneously excluded evidence would not have furthered the defense, its exclusion is more likely harmless. Nelson, 355 Wis. 2d 722, ¶49.

¶50 Monahan's defense was that either he or R.C. could have been driving at the time of the crash. Stated otherwise, Monahan argues that the jury could not have found beyond a

22

reasonable doubt that Monahan was driving at the time of the crash.  The excluded GPS data could have raised an inference that the same person was driving both before and after the two-minute stop.  When combined with the eyewitness testimony that R.C. was driving at the time the couple left the farm, this inference could have supported a jury determination that R.C. was driving at the time of the crash.

¶51  Although the weight, if any, the jury would have given to such an inference is (by definition) impossible to know, it is clear that the excluded evidence would have been complementary to the nature of the defense.  Accordingly, this factor weighs in favor of Monahan.

### 6.  The nature of the State's case

¶52  If the erroneously excluded evidence is consistent with the State's case, then its exclusion is more likely harmless.  See Martin, 343 Wis. 2d 278, ¶60.

¶53  The GPS data is irrelevant to the State's case.  The State focused its evidence on who was driving at the time of the crash; its theory of the case is compatible with either Monahan or R.C. driving between the farm and the two-minute stop.  The State's evidence that Monahan was driving at the time of the crash——Trooper Parrott's crash reconstruction, Monahan's admissions, and the DNA found on the driver's side airbag——are not affected by who was driving between the farm and the two-minute stop.  The GPS data would have neither bolstered nor undercut the State's case had it been admitted because the State's evidence was consistent with either Monahan driving the

23

whole way or Monahan and R.C. switching seats during the two-minute stop.

¶54  Because the GPS data was not inconsistent with the State's case, this factor weighs in favor of the State.

7.  The overall strength of the State's case

¶55  If the State's case was strong notwithstanding the erroneous exclusion of the GPS data, then the error is more likely harmless.  Hunt, 360 Wis. 2d 576, ¶35.  Conversely, if the State relied heavily on the exclusion of the GPS data, then the error is more likely to be prejudicial.  Martin, 343 Wis. 2d 278, ¶62.

¶56  We first address Monahan's complaint that considering the strength of the State's case improperly transforms harmless error analysis into sufficiency-of-the-evidence analysis.  We begin by noting that the strength of the State's case has long been considered an appropriate——and important——factor in harmless error analysis.  E.g., Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986) ("These factors include . . . ,of course, the overall strength of the prosecution's case."); United States v. Wilson, 134 F.3d 855, 867 (7th Cir. 1998) ("[Van Arsdell] recognize[ed] that, 'of course,' an important factor to consider is 'the overall strength of the prosecution's case.'"); State v. Fishnick, 127 Wis. 2d 247, 267, 378 N.W.2d 272 (1985); State v. Drusch, 139 Wis. 2d 312, 324 n.1, 407 N.W.2d 328 (Ct. App. 1987).  Second, we understand that courts cannot properly answer the core question——whether the State proved "beyond a reasonable doubt that the error complained of did not contribute to the

24

verdict obtained"——without considering the strength of the State's case. See United States v. Littrell, 439 F.3d 875, 883 (8th Cir. 2006). Finally, we note that error is less likely to have a "substantial influence" on the verdict where the State presented overwhelming evidence of guilt. United States v. Lane, 474 U.S. 438, 450 (1986).

¶57 For these reasons, consideration of the strength of the State's case has been——and remains——a proper and useful factor in evaluating whether a circuit court's error was harmless.

¶58 This factor cuts decisively in favor of the State because the State's case was strong, and would have remained strong even if the excluded GPS data had been admitted. First and foremost, Monahan's numerous admissions that he was driving provide substantial evidence of his guilt. He told Shullsburg firefighter Timothy Corley "I was driving, I guess" while lying in the cornfield. He then said "that is the last time I will drink and drive" within earshot of Deputy Klang. When Deputy Klang told Monahan that a female was also in the vehicle, Monahan said "I was probably driving, then." Once on the gurney, Monahan responded "yeah" when Deputy Gorham asked him "so you were the driver." While in the medical helicopter en route to the hospital, Monahan again unequivocally admitted to driving the Saab. While at the hospital, he again admitted to being the driver. He wrote that he remembered the crash and that he was driving. At the time of this writing, the attending nurse described him as "neurologically . . . intact." Finally,

25

ten months after the accident, Monahan told Trooper Parrott "[i]t's not like I meant [it to] F'ing happen."

¶59 Even if the jury had discounted all of Monahan's admissions, Trooper Parrott's crash reconstruction provided compelling evidence for the State. Trooper Parrott testified unequivocally that all of the physical evidence pointed to Monahan as the driver. Ertdmann, on the other hand, did not contradict Trooper Parrott's conclusion. In fact, Erdtmann concluded that Monahan could have been the driver. Erdtmann merely disagreed as to whether that was the only reasonable conclusion one could draw from the physical evidence.

¶60 Moreover, the physical evidence supported the State's assertion that Monahan was the driver. The seat positions—coupled with the testimony of R.C.'s mother that the driver's seat was found "much farther back than [R.C.] would have been"—indicated that Monahan was driving. The position of the bodies at the crash scene, the closed driver's side window, and the open passenger's side window indicated that R.C. was ejected first and from the passenger's seat. The dirt patterns on R.C.'s clothing—and the relative lack of dirt on Monahan's clothing—indicated that R.C. was in the passenger's seat, next to the open window.

¶61 All of these factors lead us to conclude that the State's case was very strong—and would have remained so even if the excluded GPS data had been admitted into evidence. Because of the strength of the State's case, we are not surprised that the jury came to the only reasonable conclusion: Monahan was

26

driving at the time of the crash; this factor weighs in favor of the State.

\*\*\*

¶62 Applying the relevant circumstances of Monahan's case to these factors leads to the conclusion that the erroneous exclusion of the GPS data was harmless; that is, the State has met its burden to prove "beyond a reasonable doubt that a rational jury would have found [Monahan] guilty absent the error." Hunt, 360 Wis. 2d 576, ¶26 (quoting Harvey, 254 Wis. 2d 442, ¶49).

¶63 Though we utilize the seven factors to aid in our analysis, harmless error is not subject to a precise mathematical formula. See State v. Bolstad, 124 Wis. 2d 576, 589-90, 370 N.W.2d 257 (1985); see also State v. Anthony, 2015 WI 20, ¶104, 361 Wis. 2d 116, 860 N.W.2d 10; State v. Grant, 139 Wis. 2d 45, 77, 406 N.W.2d 744 (1987) (Day, J., concurring) (describing the underlying rationale of the harmless error test to be "eliminating prejudicial error but not becoming bogged down in endless formulas for determining harmless error.").

¶64 Factors four and five weigh in favor of Monahan, as the excluded GPS data would have bolstered Monahan's theory of defense that R.C. was driving. Supra, ¶¶47-51. However, it would have done so by demonstrating a fact that was not necessary for conviction. Hunt, 360 Wis. 2d 576, ¶34; see also supra, ¶46.

¶65 Though the excluded GPS data would have bolstered Monahan's theory of defense, the factors weighing in favor of

27

the State——especially the final factor, the strength of the State's case——"tip the scales in support of harmless error." Anthony, 361 Wis. 2d 116, ¶104. As in Hunt, the State's case did not hinge on establishing who was driving the Saab, and how fast it was traveling, between the farm and two-minute stop. See Hunt, 360 Wis. 2d 576, ¶36. Rather, the strength of the State's case rested largely on Monahan's five admissions that he was driving at the time of the accident, Trooper Parrott's crash reconstruction testimony, and the DNA evidence. See id. The State never raised at trial the issue of who was driving the Saab between the farm and two-minute stop, nor how fast it was traveling during that segment, in proving the essential elements of the crime for which Monahan was convicted. See id. We agree with the court of appeals that "the [excluded] GPS data would have paled in comparison to the strong evidence that Monahan was driving at the time of the accident." Monahan, 2014AP2187-CR, ¶40.

¶66 Based on the foregoing, we conclude that "it is beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Hunt, 360 Wis. 2d 576, ¶26 (quoting Harris, 307 Wis. 2d 555, ¶42).

IV. CONCLUSION

¶67 We hold that the circuit court's erroneous exclusion of the GPS data was harmless, and therefore affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

28

¶68 REBECCA GRASSL BRADLEY, J. *(dissenting)*. In this court, everyone agrees the circuit court erred in excluding the GPS data, which revealed the excessive speeds R.C.'s car traveled both on the way to the party and on the way from the party to the stop in Shullsburg. The only question is whether this erroneous exclusion of evidence was harmless. It was not. If the jury had heard that R.C.'s car grossly exceeded the speed limit both on the way to the party and while traveling from the party to Shullsburg——when independent witnesses testified that R.C. drove away from the party——the State could not have made the same closing argument and Monahan would have had evidence to support his defense. The excluded evidence plus the State's argument——unrefuted at trial as a result of the erroneous evidentiary ruling——that R.C. never would have driven that fast on unfamiliar roads, create reasonable doubt as to whether a rational jury would have found Monahan guilty absent the error. Accordingly, I conclude the error was not harmless and respectfully dissent.

I

¶69 There were no eyewitnesses to this single car accident. Only two people actually knew what happened. One of them did not survive the accident; the other, Monahan, testified he does not remember anything between the time he and R.C. left the party and the time he woke up in the hospital. The car's GPS unit does give some information about the car's speed and location on the day of the accident. The GPS data allowed Monahan's accident reconstruction expert to calculate how fast

the car was driven both on the way to the party and on the way from the party to Shullsburg. The GPS data also showed a two-minute stop in Shullsburg. Finally, the data allowed both Monahan's and the State's accident reconstructionists to calculate the speed the car was traveling after the two-minute stop until the crash. The speed calculations estimated the car's speed on the way to the party at 79-93 miles per hour. The car's estimated speed during the segment from the party to the Shullsburg stop was 82-105 miles per hour. After the brief stop in Shullsburg, the car's speed reached 97-120 miles per hour during the trip from Shullsburg until the crash.[1] The GPS unit listed the "max speed" the car had traveled as 123 miles per hour. The only estimated speed evidence the jury heard was that at the time of the crash, the car's speed was 87-98 miles per hour. We also know that both occupants were ejected from the car during the crash and neither Monahan nor R.C. were wearing seatbelts. The sunroof and the front passenger side window were open. Finally, it is undisputed that both Monahan and R.C. had been drinking. Both had blood alcohol content above the legal limit.

¶70 The State's entire case depended on proving that Monahan was in fact driving at the time R.C.'s car crashed. There were no eyewitnesses to the crash itself and no eyewitness

---

[1] These numbers come from Monahan's expert engineer's report. The State's expert calculated only the speed at the time of the crash, and told the jury the car was traveling at 87-98 miles per hour.

put Monahan behind the wheel. To prove its case, the State presented testimony from State Trooper Thomas Parrott who prepared a reconstruction of the accident. Parrott testified he believed Monahan was driving based on where Monahan's and R.C.'s bodies landed after ejection. Parrott believed R.C. was ejected through the open passenger window before the airbags deployed. The State also introduced evidence showing that the driver's seat was positioned four inches farther back than the passenger's seat. Using this information, together with the fact that Monahan was taller than R.C., the State argued Monahan was the driver at the time of the crash. Additionally, the State relied on evidence showing the driver's side airbag had a major and a minor contributor of DNA and that the major contributor was Monahan. The State also introduced Monahan's numerous statements. In some of these statements, Monahan said he was the driver. The only GPS evidence the circuit court admitted showed that the car stopped for just over two-minutes in Shullsburg, and Parrott testified that he estimated the car's speed at the time of the crash to be between 87-98 miles per hour based upon the GPS data. The prosecutor seized upon this speed evidence to argue during closing:

> [Monahan] testified he knew the hills, knew the curves, knew the terrain of that road. Why would a young woman from Maine who's living in Chicago, who doesn't know the roads, who by all accounts hadn't been on that road and if -- had been maybe once or twice, why would she be driving? She didn't know the area.

The prosecutor further emphasized this point by arguing:

3

[R.C.] didn't know her way around. So using your common sense, you need to ask yourself, does it make sense that a young girl who doesn't know the area, is driving on some rural road and driving, no less, after she'd been drinking and at speeds of 40 to 50 miles per hour over the speed limit? That doesn't make sense . . . . Using your common sense, that tells you it's the defendant behind the wheel.

And, later, the State emphasized again:

If it's [R.C.] who was driving that night, again we'd have to believe she's driving on that rural country road in a place she's not familiar with on a road she's not familiar with. Despite the fact that she's not familiar with that road, we have to believe that she's traveling -- after having some drinks, traveling 40 to 50 miles per hour over the speed limit on a road she has no experience or familiarity with.

¶71 Without the pre-Shullsburg stop GPS speed calculations in evidence, Monahan could not refute the State's "common sense" and persuasive argument. Now, on appeal, the State concedes that excluding the pre-Shullsburg stop GPS-calculated speeds was in fact error, but it asserts the exclusion was harmless error. The majority agrees with the State that this error was harmless——that it had no impact on the verdict and even if the jury heard the complete GPS evidence, the jury still would have convicted Monahan. In reaching its harmless error conclusion, the majority improperly applied the harmless error standard. Applying the harmless error standard correctly, I conclude the exclusion of the GPS evidence was not harmless and I would reverse the decision of the court of appeals and remand for a new trial.

II

¶72 Before Congress adopted the harmless error rule in 1919, criminal cases were retried with some regularity when an

4

error occurred during the trial, regardless of whether the error was minimal or material. See, e.g., Kotteakos v. United States, 328 U.S. 750, 759 (1946) ("[Appellate courts] tower above the trials of criminal cases as impregnable citadels of technicality" (quoting Marcus A. Kavanagh, Improvement of Administration of Criminal Justice by Exercise of Judicial Power 11 A.B.A.J. 217, 222) (1925)). The federal harmless error rule was codified "to prevent matters concerned with the mere etiquette of trials and with the formalities and minutiae of procedure from touching the merits of a verdict." Bruno v. U.S., 308 U.S. 287, 294 (1939). The rule, versions of which have been enacted in Wisconsin and other states, "block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." Chapman v. California, 386 U.S. 18, 22 (1967). The error in Monahan's trial cannot be fairly characterized as "mere etiquette" nor minutiae of procedure. The error precluded him from presenting his defense with respect to the main issue at trial: who was driving the car.

¶73 Whether an error is harmless beyond a reasonable doubt is a question of law. See State v. Nelson, 2014 WI 70, ¶18, 355 Wis. 2d 722, 849 N.W.2d 317. The harmless error test is easily defined but difficult to apply. The test requires the State to prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" by showing "that a rational jury would have found the defendant guilty absent the error." State v. Hunt, 2014 WI 102, ¶26, 360 Wis. 2d 576, 851

5

N.W.2d 434. The reviewing court looks at the effect the error had on the verdict. Id. In applying the harmless error test, we consider several factors. As relevant here, the court examines: (1) the importance of the erroneously excluded evidence; (2) whether there is evidence corroborating or contradicting the erroneously excluded evidence; (3) "the nature of the defense"; (4) "the nature of the State's case"; and (5) "the overall strength of the State's case." Id., ¶27.[2]

¶74 Factor (1), the importance of the excluded evidence, cannot be disputed, particularly given the State's exploitation of it during closing argument. Monahan's only defense was that he was not driving at the time of this accident. The excluded evidence would have supported that defense. If all the GPS evidence had been admitted, the jury would have learned R.C. drove her car excessively fast. It would have shown that despite her unfamiliarity with the area, she drove far above the posted 55 miles per hour speed limit. Applying factor (1) demonstrates the harmfulness of excluding the GPS data.

---

[2] The majority considers two additional factors——frequency of the error and whether the excluded evidence would have been duplicative. These extra factors are referenced in a 2012 case, State v. Martin, 2012 WI 96, ¶46, 343 Wis. 2d 78, 816 N.W.2d 270, cited by the majority. Majority op., ¶35. The list of factors considered under the harmless error test are non-exhaustive. See State v. Hunt, 2014 WI 102, ¶27, 360 Wis. 2d 576, 851 N.W.2d 434. In any event, the frequency-of-an-error factor is of limited value when the error was exclusion of evidence and thus I do not address it. As for the duplicative factor, the majority concedes that this favors Monahan as it is undisputed that exclusion of the complete GPS speed evidence was not duplicative of other admitted evidence. Majority op., ¶48.

¶75 As to factor (2), Monahan would have used the GPS evidence to show R.C. drove at high rates of speed. There was no evidence in the record to that effect. The State did not and could not present any direct evidence or eyewitness testimony to disprove Monahan's defense that R.C. was driving her car and refused to let anyone else drive it. The main evidence contradicting this defense was Parrott's supposition, bolstered by the State's closing argument that R.C. never would have driven so fast on unfamiliar roads. Admitting all the GPS evidence would have supported Monahan's defense and poked holes in the State's argument. Applying factor (2) illustrates how excluding this evidence was harmful.

¶76 Factor (3) looks to the nature of the defense. Monahan presented contrary expert witness testimony from his engineering expert, Paul Erdtmann, who reconstructed the accident. Erdtmann opined that it is impossible, based on the physical evidence, to discern who was driving at the time of the crash. Erdtmann refuted each of the factors underlying Parrott's opinion that Monahan was driving. Erdtmann presented a photo showing a woman of R.C.'s height could comfortably reach the controls to operate the same type of car with the driver's seat in the same position. Another photo showed that a man of Monahan's height would fit comfortably in the passenger side of the same type of car with the seat in the same position as the subject car's passenger seat. Erdtmann offered an explanation for the major and minor DNA located on the driver's airbag——the bodies were moving around during the rollover and both could

7

leave DNA on the airbag regardless of which seat each occupied. Moreover, State-witness, Dr. Robert Corliss, a forensic pathologist who performed R.C.'s autopsy, testified on cross-examination that, in a rollover accident during which the car's occupants were not wearing seatbelts and were ejected from the car, it is not possible to discern whether R.C. was in the driver's or passenger's seat.

¶77 Monahan also testified in his own defense. He explained he had no memory of the accident. He remembered leaving the party with R.C., who was driving him in her car. She had driven him to the party and she drove him after the party. He told the jury that he never drove R.C.'s car because she never let anyone else drive it.

¶78 One eyewitness testified R.C. was driving when the two arrived at the party. No witness contradicted that testimony. Two other independent eyewitnesses who were at the party testified they recalled R.C. driving when she and Monahan left the party. One remembered Monahan flashing a big smile at her from the passenger seat as the car drove away. The other testified that Monahan and R.C. walked by him on the way to her car and the witness saw R.C. get in the driver side and saw Monahan in the passenger seat. No witness contradicted that testimony. A third independent witness testified that R.C. never let anyone drive her car. No witness contradicted that testimony.

¶79 The defense case was not weak, and admission of the excluded GPS evidence certainly would have strengthened it,

8

lending credibility to Monahan's testimony and raising reasonable doubt. Applying factor (3) necessitates the conclusion that the erroneous exclusion was harmful.

¶80 Factors (4) and (5) each address the State's case and will be considered together. The State's case was likewise not weak. Its accident reconstructionist put Monahan in the driver's seat at the time of the crash. The State presented Monahan's multiple statements to the effect that he was driving through live testimony of the eyewitnesses who heard the statements. These statements consisted of (1) statements at the scene, (2) statements in the helicopter transporting him to the hospital, (3) statements at the hospital, and (4) statements after recovery. First, at the scene:

- When emergency personnel found Monahan in a cornfield, he was unconscious and unrecognizable. When Monahan regained consciousness, he repeatedly asked "what happened"; he did not know who he was or how many people were in the car or where he had been. EMTs repeatedly asked him who was driving, but received no answer. Monahan eventually responded, "I was driving, I guess."

- The Chief of Police, Richard Moyer, asked Monahan if there was anyone else in the car and Monahan said he did not know; when Moyer asked who was driving, Monahan responded that he did not know.

- Sergeant Darrell Morrissey testified that when he asked Monahan who was driving, Monahan said he did not remember or did not know. When Morrissey asked Monahan if there

9

was anyone else in the car besides R.C., Monahan answered he was not sure.

- Deputy Sheriff Paul Klang testified he asked Monahan if he was the driver and Monahan replied that he did not remember. When Klang told Monahan there was a female in the car, Monahan said, "I probably was driving, then." Monahan told Klang he did not remember where he was coming from. Klang also told the jury that he overheard Monahan say to an EMT or firefighter, "that is the last time I will drink and drive."

- An EMT, who was also a religious minister, testified he heard Monahan say "I fell asleep" and "I'll never drink again."

- Sheriff Deputy Michael Gorham testified he spoke with Monahan at the scene while Monahan was lying on a backboard and being tended to by emergency personnel. Gorham asked how many people were in the car. Monahan answered: "It depends who's asking" and subsequently said that he and "his girlfriend" were in the car. When Gorham asked who was the driver, Monahan said "I might have been, I guess."

- Gorham again approached Monahan, this time with a digital tape recorder to get a more definitive statement. When Gorham asked, "Were you the driver?", Monahan answered, "Yeah, I guess." Gorham told Monahan a fireman said he saw Monahan driving the car out of Shullsburg and asked "so you were the driver?" Monahan replied, "Yeah, I

10

guess." When Gorham asked, "You're not BSing or anything right?", Monahan answered, "I don't think so." The audio-recording was played for the jury and Monahan can be heard groaning in pain. Medical personnel interrupted Gorham's questioning to insert an IV. Monahan expressed he was in pain. Gorham resumed the questioning, asking if Monahan could "explain what happened," and Monahan replied, "No." Gorham pressed, "You don't remember how the crash occurred?" to which Monahan replied, "My tires went off the side of the road and I believe it was I lost control." [sic] When Gorham followed up by asking about the tires, Monahan asked, "Can we talk tomorrow?"[3]

¶81 During the flight to the hospital, Monahan told the flight nurse and medic he remembered what happened——he was driving and he was wearing his seatbelt. Prior to the flight, Monahan had been given Fentanyl, a pain medication.

¶82 At the hospital, Monahan signaled to his nurse that he wanted paper and pencil. He could not speak because he was intubated. Monahan wrote he remembered the accident——he was going too fast over a hill and lost control.

¶83 During an interview with a state trooper ten days after the crash and after Monahan had been released from the hospital, Monahan said he had "no idea" who was driving at the time of the crash and he "did not have memory of the crash at

---

[3] No firefighter testified to making the statement to Gorham and Gorham told the jury he was not able to locate the firefighter.

11

all." Monahan also told the trooper that the car belonged to R.C. and he had never driven her car. Five months after the crash, the state trooper interviewed Monahan again. Monahan told the trooper he still had no recollection of the crash. Monahan said R.C. was an aggressive, "kind of nuts" driver. The trooper asked Monahan to give a DNA sample so it could be compared to physical evidence collected from the car. Monahan agreed, saying, "It doesn't matter, you know, I wasn't driving." At the time of this statement, Monahan was still seeing a neurologist. He was not cleared to return to work until nine months after the accident.

¶84 The State's case relied on Monahan's statements, Parrott's reconstruction opinion, and the DNA airbag evidence. In addition, R.C.'s mother testified during the State's rebuttal case that R.C. drove as close to the steering wheel as possible.[4] Although this evidence is certainly sufficient to convict Monahan, it is by no means overwhelming. First, Monahan's statements are far from conclusive. Most could be accurately described as equivocal. Many of his statements were given within minutes of a high-speed car crash, which caused serious injury, including immediate unconsciousness and a later-

---

[4] The actual testimony was: "She would always have her seat as close up to the steering wheel as she possibly could." And when shown Erdtmann's photo she said: "The model is much farther back than [R.C.] would have been."

12

diagnosed head injury.[5] One of Monahan's statements was given only after being told he was the driver. Many of these statements were given while Monahan was in severe pain. His statement in the helicopter admitting that he was driving was given at the same time he either lied or mistakenly stated he was wearing his seatbelt. It could easily be discounted.

¶85 Second, Parrott was not the only reconstructionist to testify at trial. Monahan's expert refuted Parrott's testimony in every regard. And, the jury heard that Parrott's report included false information. Namely, his report said he excluded R.C. as the driver because lab results analyzing the car's window fragments did not contain R.C.'s DNA. At trial, Parrott admitted that this was an error——no glass fragments were ever tested in this case. Parrott explained this mistake appeared in his report because he "cut and pasted" it from another report for a different "who was the driver" reconstruction case; he inserted R.C.'s name in place of the person from his other case. Moreover, Parrott's opinion that Monahan was driving was based on his comparison of Monahan's and R.C.'s shoes to what he claimed were "little flecks" on the gas and brake pedal. But, he admitted he was not a footprint expert. He conceded that Karley Hujet of the Wisconsin State Crime Lab, who performed the official analysis of the pedals and the shoes, was the footprint

---

[5] Monahan's medical records show he had surgery on his spleen, was hospitalized for six days, and his injuries included traumatic shock, lung contusion, fractures to the cervical, lumbar, and thoracic vertebrae, rib fracture, and a concussion with loss of consciousness.

13

expert. Hujet testified that she could not conclusively say there was a footwear impression and in comparing the pedals to the shoes, she could not say who was driving. Parrott told the jury the reason he could opine that Monahan's shoes were on the pedals when Hujet could not was because Hujet was bound by industry standards, which did not apply to him.

¶86 Third, Monahan's expert gave an explanation regarding the DNA on the airbag, which refuted Parrott's opinion on seat position and dirt evidence. Parrott's reconstruction theory had R.C. ejecting from the car before the airbags deployed, leaving unanswered the question of why the driver's airbag had a second person's DNA on it.

¶87 Finally, R.C.'s mother's testimony that her daughter would drive with her seat as close to the steering wheel as possible cannot prove that R.C. did so while driving her car on the day of the crash nor can it establish that Monahan was driving. We simply do not know, and the mother's testimony alone cannot make the erroneous exclusion of the complete GPS evidence harmless.

¶88 There certainly are cases in which the State's evidence is so overwhelming and uncontested that a reviewing court can say, as a matter of law, the evidentiary error had no impact. But this is not one of those cases. Factors (4) and (5) do not demonstrate beyond a reasonable doubt that excluding the GPS evidence had no impact on the verdict or that the jury would have convicted Monahan absent the error.

14

¶89 Application of the <u>Hunt</u> factors shows that the erroneous exclusion of evidence in this case was not harmless. This was a close case. Excluding the complete GPS data prevented Monahan from introducing evidence to corroborate his expert's opinion and his defense. At the same time, its exclusion allowed the State to persuasively argue in favor of its expert's theory. We do not know which theory a jury presented with all the GPS evidence would believe. But, its exclusion, exploited by the State in its closing, creates reasonable doubt as to whether a rational jury would have found Monahan guilty absent the error; the State has failed to prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Therefore, the error was not harmless and Monahan should get a new trial during which he can present the GPS evidence to support his defense.

III

¶90 The trial court's erroneous exclusion of evidence prevented Monahan from fully presenting his defense, which is a constitutional error. A criminal defendant has a Sixth Amendment right to present his defense. <u>Washington v. Texas</u>, 388 U.S. 14, 18-19 (1967) (discussing criminal defendant's "right to present a defense, the right to present the defendant's version of the facts" so the jury can compare to the State's version to "decide where the truth lies."). "The evidence the defendant seeks to introduce, however, must be 'both material and favorable to his defense.'" <u>State v. Ward</u>, 2011 WI App 151, ¶16, 337 Wis. 2d 655, 807 N.W.2d 23 (quoting

15

United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)). The evidence excluded in this case is material and favorable to Monahan's defense, satisfying both criteria. By excluding this evidence, the circuit court violated Monahan's right to present a defense. A new trial would give him a fair opportunity to defend against the State's accusations. Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.").

¶91 The trial court committed a constitutional error in depriving the jury of evidence material to Monahan's defense and the majority errs in denying Monahan a new trial in which he could present it. Because it is far from clear beyond a reasonable doubt that a rational jury would have found Monahan guilty if it had heard the excluded evidence, I respectfully dissent.

¶92 I am authorized to state that Justices SHIRLEY S. ABRAHAMSON and ANN WALSH BRADLEY join this dissent.

16